**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD C. SMITH, Individually and on behalf of all others similarly situated, | Case No. 19-cv-04801-JST |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| NETAPP, INC., et al. | **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiff Winston Derouin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his undersigned attorneys, alleges the following against Defendants NetApp, Inc. ("NetApp" or "Company"), George Kurian ("Kurian"), Ronald J. Pasek ("Pasek"), and Matthew K. Fawcett ("Fawcett"), based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, review and analysis of NetApp's conference call transcripts, public disclosures, including press releases, United States Securities and Exchange Commission ("SEC") filings, analysts' reports and advisories about the Company, and information readily available from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Defendants on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired NetApp's publicly traded securities from May 23, 2019 through August 1, 2019, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages Defendants' violations of the federal securities laws caused and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      On August 1, 2019, NetApp pre-announced that it would miss its first quarter fiscal 2020[1] revenue projection by hundreds of millions of dollars and its earnings per share projections by almost fifty percent. The miss surprised investors. Defendants, however, knew before the start of the Class Period that macroeconomic

---

[1] NetApp's fiscal year ends on the last Thursday in April. In 2019 the fiscal year ended on April 26.

Amended Class Action Complaint for Violation of the Federal Securities Laws

factors were causing the Company's largest "enterprise" customers to curtail, downsize, and delay purchases, and that the situation was deteriorating. Defendants knew when they issued their forecast that these factors would cause the Company to fall materially short of their May 22, 2019 projections.

3.     On June 18, 2019, more than halfway through NetApp's fiscal 2020 first quarter ("Q1 2020"), the Company filed its 2019 10-K, continuing to mislead investors about the impact of the macroeconomic factors and the then-existing impact on Q1 2020 revenue and earnings. In the 2019 10-K, the Company warned hypothetically that if their largest customers reduced or delayed spending decisions, it could materially and adversely affect NetApp's financial results. Defendants, however, omitted from the 2019 10-K that they already knew that large customers had materially reduced their spending, that the hypothetical risk about which they warned had materialized before they filed the 2019 10-K, and that the deterioration was of a materially greater magnitude in June than had been previously disclosed.

4.     On August 1, 2019, after the market close, NetApp pre-announced Q1 2020 results. The magnitude of the guidance miss shocked investors with net revenue for the quarter falling up to $242 million below the top end of the quarterly guidance and earnings per share approximately 50% lower than the midpoint guidance range. On this news, on August 2, 2019 NetApp stock dropped $11.67, over 20%, falling from $57.71 to $46.04. As a direct and proximate result of Defendants' knowing dissemination of materially false revenue and earnings per share projections, Plaintiff and the Class suffered damages.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

- 2 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

7.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as NetApp is headquartered in this District, all Defendants conduct business in this District, and a significant portion of the NetApp Defendants' actions took place within this District.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND OTHER RELEVANT PERSONS

9.     Plaintiff Winston Derouin purchased NetApp securities during the Class Period as stated in his Certification (ECF No. 21-2) and Loss Chart (ECF No. 21-3), and suffered losses as a direct and proximate result of Defendants' wrongful conduct.

10.     Defendant NetApp was founded in 1992 and is incorporated in Delaware. Its principal executive offices are located at 1395 Crossman Avenue, Sunnyvale, California 94089. NetApp's securities trade on the NASDAQ under the ticker symbol "NTAP." According to the 2019 10-K, NetApp is an "authority for hybrid cloud[,] provid[ing] a full range of hybrid cloud data services that simplify management of applications and data across cloud and on-premises environments to accelerate digital transformation." With the Company's partners, the 2019 10-K continued, NetApp "empower[s] global organizations to unleash the full potential of their data to expand customer touchpoints, foster greater innovation and optimize their operations."

11.     Defendant Kurian joined NetApp in 2011 as Executive Vice President of product operations. Kurian was appointed as NetApp's Chief Executive Officer ("CEO") in June 2015, and as NetApp's President in May 2016. Kurian served as NetApp's CEO at all relevant times. Kurian signed the following SEC filings: the

Amended Class Action Complaint for Violation of the Federal Securities Laws

June 18, 2019 10-K ("2019 10-K"). In addition, Kurian signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attached as exhibits to the following SEC filings: 2019 10-K; February 19, 2019 10-Q (2019 3Q 10-Q"). Kurian represented NetApp and spoke in conference calls with analysts and investors during which NetApp's First Quarter 2020 Guidance and Full Year 2020 Guidance were discussed on the following dates: February 13, 2019; May 22, 2019; August 1, 2019; August 15, 2019.

12. Defendant Pasek joined NetApp in April 2016 as Executive Vice President and Chief Financial Officer ("CFO"). Pasek served as NetApp's CFO at all relevant times. During the Class Period, Pasek signed the following SEC filings: 2019 10-K. In addition, during the Class Period, Tedford signed SOX certifications attached as exhibits to the following SEC filings: 2019 10-K; 2019 3Q 10-Q. Pasek represented NetApp and spoke in conference calls with analysts and investors during which NetApp's First Quarter 2020 Guidance and Full Year 2020 Guidance were discussed on the following dates: February 13, 2019; May 22, 2019; August 1, 2019; August 15, 2019.

13. Defendant Fawcett was NetApp's Senior Vice President, General Counsel, and Corporate Secretary at all relevant times. Fawcett signed the following SEC filings: May 22, 2019 8-K attaching a press release entitled "NetApp Reports Fourth Quarter and Fiscal Year 2019 Results"; August 1, 2019 8-K attaching a press release announcing "Selected Preliminary First Quarter of Fiscal Year 2020 Results"; August 14, 2020 8-K attaching a press release reporting NetApp's "First Quarter of Fiscal Year 2020 Results."

14. Joel D. Reich was NetApp's Executive Vice President for Product Operations at all relevant times.

15. Defendants Kurian, Pasek, and Fawcett are sometimes referred to herein, collectively, as the "Individual Defendants."

Amended Class Action Complaint for Violation of the Federal Securities Laws

16.     The Individual Defendants and NetApp are referred to herein, collectively, as the "Defendants."

17.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating some or all of the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified false and misleading statements in violation of the federal securities laws.

18.     Defendants Kurian and Pasek signed false SOX certifications attesting to the material accuracy of financial statements. In each SOX Certification referenced in this Amended Complaint the signatory certified that:

> 1.     I have reviewed this [Quarterly or Annual] Report on Form [10-Q or 10-K] of NetApp, Inc.;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

- 5 -

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report ….

19.    NetApp is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

21.    NetApp is in the data storage industry, concentrating primarily on cloud data services, private cloud, and storage markets. NetApp offers a range of hybrid cloud data services and hardware to manage data across clouds and on-premises environments. NetApp has over 10,000 employees worldwide. In fiscal year 2019 NetApp had revenues of approximately $6.1 billion, with the majority of that revenue earned in the Americas. During the May 22, 2019 earnings conference call to discuss Q4 2019 results ("May 22 Call"), Defendant Pasek told analysts that NetApp has business relationships with "probably 95% of the Fortune 1000."

22.    NetApp sells its products and services through what it refers to as a "multichannel distribution strategy." Rather than through its own sales force, most of its sales are through partners, including distributors, technology partners, value-added resellers, systems integrators, original equipment manufacturers, and service providers. According to NetApp's 2019 10-K, sales through indirect channels

Amended Class Action Complaint for Violation of the Federal Securities Laws

accounted for 76% of NetApp's revenue in fiscal year 2019. The 2019 10-K states that NetApp's two biggest customers, responsible for a total of 44% of fiscal year 2019 sales, were distributors. Those customers largely purchased from the storage segment of NetApp's business.

***NetApp's Financial Success is Dependent on a Small Number of Large Enterprise Customers***

23.   Despite annual revenues in the billions of dollars, NetApp's financial success is dependent on a small number of large customers and distributors, referred to by the Company and the industry as "enterprise" customers. In the 2019 10-K, NetApp stated that "a significant portion" of their net revenues "are generated through sales to a limited number of customers and distributors." Before the Class Period, NetApp warned that changes in this small group's ordering patterns would materially impact its financial results. In fact, NetApp stated that a downturn or negative change in the spending or decision cycles of enterprise customers negatively affects NetApp's bottom line more than those of its competitors.

24.   NetApp stated that it had greater visibility into the spending patterns of enterprise customers than those same competitors. During the May 22 Call, Defendant Kurian bragged that "we have close relationships with most of the largest customers in the world," and "a lot of access," and that NetApp's close relationships with its largest enterprise customers gave it great visibility into their spending patterns, and the ability to foresee significant changes in their spending patterns. During the same Call, Kurian stated, with respect to NetApp's largest customers, that Defendants were "very, very close to them and close to the channel" and that "we'll be able to see the visibility on any turn faster than most people."

***Months Before the Class Period, Defendants Knew that Macroeconomic Factors Were Driving Down Enterprise Customers' Spending***

25.   Macroeconomic issues were already affecting the spending patterns of NetApp's largest customers as the calendar turned to January 2019. During a

Amended Class Action Complaint for Violation of the Federal Securities Laws

February 13, 2019 earnings call to discuss Q3 2019 results ("February 13 Call"), Defendant Kurian stated that "the largest customers are the ones that are most affected by … both economic and political uncertainty around the globe …." During both the August 1, 2019, Q1 2020 Guidance Call ("August 1 Call") and the August 15, 2019 earnings call to discuss Q1 2020 results ("August 15 Call"), Defendant Kurian stated that the "macro headwinds" affecting enterprise spending included "the trade dispute between the U.S. and China." During these calls Defendants also referenced the British withdrawal from the European Union as another macro headwind. At the start of the Class Period, during the May 22 Call, Defendant Pasek, in scripted comments, stated that the Company expected "China tariffs … to have a material impact on our business in fiscal 2020."

26.    Defendants' visibility into the macro issues affecting spending extended all the way back to January of 2019. During the May 22 Call, Defendant Kurian lamented the Company's disappointing performance in the fourth quarter of 2019, stating that he "take[s] execution seriously," and that the Company recognizes the downturn as "not the result of competitive dynamics" because Defendants "have a good sense for the industry trends."

27.    Defendants announced to investors that they had identified the negative spending trend months before the Class Period. During the February 13 Call, Defendant Kurian, expressing disappointment at Q3 2019 revenues being below expectations, stated in scripted remarks that "we saw slowdown in purchasing across the board in January, driven by deteriorating outlooks for the global economy, as well as uncertainty around trade policy." Kurian further stated with respect to "the rate of deceleration" in spending by enterprise customers that "things changed materially through the last week of December and really January."

28.    Further, during the May 22 Call, Kurian stated that "[t]he data center buying behavior of large customers that we saw in January continued through Q4. Customers are buying, but deals are taking longer and require greater effort to

Amended Class Action Complaint for Violation of the Federal Securities Laws

close." Kurian also discussed the "slower spending in our largest customers" and that "certain customers … are taking a longer time to make purchasing decisions."

29.     During the August 15 Call Defendant Kurian again admitted that NetApp saw the disturbing spending trend by enterprise customers long before the Class Period, stating "we have seen a steady deceleration in the macro outlook at our largest customers that has impacted their capital expenditures …. since the start of the year."

30.     Defendants understood that the decreased spending by enterprise customers would not be reversed in a short period of time. During the February 13 Call, Defendant Kurian admitted that "with regard to some of our largest customers … there will be time before they come back to their normal course of spending."

31.     Analysts too saw the macro-driven spending declines driving down revenue long before the Class Period. During the May 22 Call, an SIG analyst stated that "over the past six months [] some of these forecasts have not really materialized, it seems like your enterprise customers have already upgraded what they need to upgrade." Defendant Kurian did not disagree with the analyst's statement about enterprise customer spending.

***Despite Knowing that the Enterprise Spending Market Had Significantly Deteriorated, Defendants Forecast Revenue and Earnings Per Share Growth for the First Quarter of the 2020 Fiscal Year***

32.     On May 22, 2019, after the close of market, NetApp filed an 8-K, signed by Defendant Fawcett, concerning financial results for the fourth quarter and fiscal year ended April 26, 2019. Attached to the 8-K was a press release entitled "NetApp Reports Fourth Quarter and Fiscal Year 2019 Results," ("May 22 Press Release") disclosing both Q4 2019 financial results and NetApp's revenue and earnings per share guidance for Q1 2020, beginning on April 27, 2019, and for the full fiscal year 2020.

Amended Class Action Complaint for Violation of the Federal Securities Laws

33.   Defendants Kurian and Pasek then participated in the May 22 Call, which began at 5 p.m.

34.   In the May 22 Press Release, NetApp disclosed that its fiscal year 2019 results showed a "shortfall relative to our fiscal year 2019 expectations …." Defendant Pasek stated during the May 22 Call that NetApp's 4Q 2019 net revenues were down 3% from NetApp's 4Q 2018 revenues, and that product revenues in 4Q 2019 were 2.5% lower than in 4Q 2018.

35.   Despite having discussed months earlier that macroeconomic conditions were materially affecting enterprise customers' buying decisions since January 2019, and admitting during the May 22 Call that they knew that spending behavior had not improved up to the date of the Call, during the May 22 Call Defendant Kurian announced that the outlook for fiscal year 2020 "is quite good."

36.   Defendants projected a year-over-year increase in first quarter 2020 revenues and full fiscal year 2020 revenues. NetApp forecast first quarter 2020 revenues of between $1.315 and $1.465 billion, and first quarter 2020 GAAP earnings per share of between $0.56 and $0.64 cents. The revenue guidance, accounting for currency headwinds and changing Enterprise License Agreement ("ELA") revenues, implied a 1% growth year-over-year.

37.   NetApp further forecast that revenues in fiscal year 2020 would be low single digits higher than in fiscal year 2019.

**FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

38.   On May 22, 2019, after the market close, NetApp announced guidance for the first quarter of fiscal year 2020 and for full fiscal year 2020. Defendants forecast Q1 2020 revenues of between $1.315 and $1.465 billion, and Q1 2020 GAAP earnings per share of between $0.56 and $0.64 cents. The revenue guidance, accounting for currency headwinds and ELAs, implied a 1% growth year-over-year. NetApp further forecast fiscal 2020 revenues growing by low-single digits over fiscal year 2019 revenues.

Amended Class Action Complaint for Violation of the Federal Securities Laws

39.     The foregoing forecasts were materially and knowingly false and/or misleading. Defendants knew at the time of issuing the forecasts that the Company would fall materially short of the projections because:

    a.  Defendants knew that NetApp's financial success was dependent on a small number of very large enterprise customers, and that changes in these customers' ordering patterns would materially impact NetApp's financial condition, and impact NetApp's financial results more than it would its competitors' results;

    b.  Defendants knew that as of at the latest December 2018, enterprise customers had greatly reduced their spending and lengthened their decision cycles because of macroeconomic issues over which NetApp had no control;

    c.  Defendants knew that at the beginning of calendar year 2019 the "rate of deceleration" in spending by enterprise customers worsened materially, and remained materially worse up to the start of the Class Period, and that the "deceleration" in spending by enterprise customers was worsening;

    d.  Defendants knew that the decreased spending by large enterprise customers would not be reversed for an extended period of time;

    e.  No risk disclosure short of NetApp disclosing on May 22, 2019 that it knew that the Company would not achieve the Q1 2020 revenue and earnings per share guidance would be meaningful.

40.     On June 18, 2019, almost two months into Q1 2020, NetApp filed its 2019 10-K. The 2019 10-K contained the following risk disclosure:

> ***A portion of our revenues is generated by large, recurring purchases from various customers, resellers and distributors. A loss, cancellation or delay in purchases by any of these***

Amended Class Action Complaint for Violation of the Federal Securities Laws

**parties has negatively affected our revenues in the past, and could negatively affect our revenues in the future.**

A significant portion of our net revenues are generated through sales to a limited number of customers and distributors. We generally do not enter into binding purchase commitments with our customers, resellers and distributors for extended periods of time, and thus there is no guarantee we will continue to receive large, recurring orders from these customers, resellers or distributors. For example, our reseller agreements generally do not require minimum purchases, and our customers, resellers and distributors can stop purchasing and marketing our products at any time. In addition, unfavorable economic conditions may negatively impact the solvency of our customers, resellers and distributors or the ability of such customers, resellers and distributors to obtain credit to finance purchases of our products. If any of our key customers, resellers or distributors changes its pricing practices, reduces the size or frequency of its orders for our products, or stops purchasing our products altogether, our operating results and financial condition could be materially adversely impacted.
(emphasis in original).

41.   The foregoing risk disclosure was materially false and/or misleading for omitting mention that the risk had already materialized. Defendants knew or were reckless in not knowing that:

    a.  By June 18, 2019 Defendants were almost two months into the first fiscal quarter of 2020. During the August 1 Call, Defendants admitted that by the second half of Q1 2020 they knew that the Company would fall materially short of its revenue and earnings per share forecasts;

    b.  Defendants knew or disregarded that not only had this general risk already materialized, but that the sales deceleration by "key customers, resellers or distributors" "reduc[ing] the size and frequency of their orders" for NetApp's products was of materially greater magnitude in June than had been previously disclosed. Defendants were duty bound,

Amended Class Action Complaint for Violation of the Federal Securities Laws

but failed, to disclose that the specific adverse event the Company was warning of hypothetically had already transpired, rendering the foregoing risk disclosure false and misleading;

c.  Defendants knew that NetApp's financial success was dependent on a small number of very large enterprise customers, and that changes in these customers' ordering patterns would materially impact NetApp's financial condition, and impact NetApp's financial results more than it would its competitors' results;

d.  Defendants knew that at least as early as January 2019, enterprise customers had greatly reduced their spending and lengthened their decision cycles because of macroeconomic issues over which NetApp had no control;

e.  Defendants knew that at the beginning of calendar year 2019 the "rate of deceleration" in spending by enterprise customers worsened materially, and remained materially worse up to the start of the Class Period;

f.  Defendants knew that the decreased spending by large enterprise customers would not be reversed for an extended period of time.

### DEFENDANTS' DUTY UNDER SEC REGULATION S-K ITEM 303

42.  The SEC has created specific rules governing the content of disclosures made by public companies in their SEC filings. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

Amended Class Action Complaint for Violation of the Federal Securities Laws

43.     Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

44.     Note 19 to NetApp's financial statements in the 2019 10-K, filed in the second half of Q1 2020 ("Note 19"), contained a "Subsequent Events" section where Defendants should have listed any "known trends or uncertainties."

45.     Defendants were aware of the duties imposed by item 303. In Note 19, "Subsequent Events," Defendants revealed that on May 23, 2019, just one week into Q1 2020, NetApp purchased all of the shares of another company for $56 million in cash. Note 19 in the 2019 10-K does *not* contain any discussion or mention of the materially greater magnitude in the deterioration in the buying habits of NetApp's enterprise customers in June than had been previously reported.

46.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

47.     As set forth in detail above, Defendants violated their affirmative duties under Regulation S-K, Item 303, and thus Section 10(b) of the Exchange Act, failing to disclose the following material information in the 2019 10-K during the Class Period because:

Amended Class Action Complaint for Violation of the Federal Securities Laws

a. They knew that the deceleration in purchases by enterprise customers was of materially greater magnitude in June than had been previously;

b. By their own admission, Defendants knew about the materially greater magnitude of deceleration in June in purchasing by the large enterprise customers than had been previously disclosed before the 2019 10-K was filed during the second half of Q1 2020, because Defendants admitted during the August 1 Call that they knew about the increasing magnitude in deterioration by the second half of Q1 2020.

48.   Defendants had a duty to disclose because the foregoing facts they concealed were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

## DEFENDANTS' DUTY UNDER GAAP

49.   Generally accepted accounting standards ("GAAP") are those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

50.   The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). A Statement of Financial Accounting Standards ("SFAS") is a formal document issued by the FASB which details accounting standards and guidance of the FASB's accounting policies. A SFAS is issued with

Amended Class Action Complaint for Violation of the Federal Securities Laws

1  the expectation that companies listed on a stock exchange in the United States will
2  adhere to it.

3      51.    SEC rules and regulations require that publicly traded companies such
4  as NetApp include financial statements that comply with GAAP in their annual and
5  quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act;
6  Rule 10-01(d) of SEC Regulation S-X.

7      52.    FASB's Statements of Financial Accounting Concepts ("CON __")
8  provide the framework for financial accounting. As stated in FASB's CON 8,
9  "Conceptual Framework for Financial Reporting," the "objective of general purpose
10 financial reporting is to provide financial information about the reporting entity that
11 is useful to existing and potential investors, lenders, and other creditors in making
12 decisions about providing resources to the entity." CON 8 ¶ OB2.

13     53.    Faithful representation is a primary quality rendering financial
14 information useful. Faithfully represented information must be complete, neutral,
15 and free from error. CON 8 ¶ QC12. To be complete, financial information must
16 include all information necessary for a user to understand the subject depicted,
17 including all necessary descriptions and explanations. CON 8 ¶ QC13.

18     54.    GAAP provision ASC 855-10-20 defines a "nonrecognized subsequent
19 event" that must be disclosed in an issuer's annual report as "events that provide
20 evidence about conditions that did not exist at the date of the balance sheet but
21 arose subsequent to that date (that is, nonrecognized subsequent events)."

22     55.    GAAP provision ASC 855-10-50-2 states that "[s]ome nonrecognized
23 subsequent events may be of such nature that they must be disclosed to keep the
24 financial statements from being misleading.  For such events, an entity shall
25 disclose the following: a. The nature of the event; b. An estimate of its financial
26 effect, or a statement that such an estimate cannot be made."

27     56.    GAAP creates a duty to disclose nonrecognized subsequent events
28 when doing so makes an issuer's annual financial statements not misleading.

Amended Class Action Complaint for Violation of the Federal Securities Laws

57.    As set forth in detail above, NetApp Defendants violated the affirmative duties under ASC 855-10-50-2 and ASC 855-10-50-2, and thus Section 10(b) of the Exchange Act, failing to disclose in the "subsequent events" note to the annual financial statements that the deterioration in purchases by enterprise customers was of a materially greater magnitude in June than had been previously disclosed because:

      a. Defendants knew that deterioration in purchases by enterprise customers was of a materially greater magnitude in June than had been previously disclosed;

      b. Defendants knew about the material deterioration in purchasing by the large enterprise customers before the Company filed the 2019 10-K during the second half on Q1 2020 on June 18, 2019, because Defendants admitted during the August 1 Call that they knew by the second half of Q1 2020;

## THE TRUTH EMERGES

58.    On August 1, 2019, after the market close, Defendants filed an 8-K, signed by Defendant Fawcett, to which was attached a press release entitled "NetApp announces selected preliminary first quarter of fiscal year 2020 results."

59.    In the press release Defendants announced that they would materially underperform the first quarter revenue guidance range issued on May 22, 2019.

60.    Defendants announced that first quarter 2020 revenues would be in the range of $1.22-$1.23 billion, $243 million lower than the upper range of the earlier projection of $1.315-$1.465 billion.

61.    Defendants announced that first quarter 2020 GAAP earnings per share would be in the range of $0.30-$0.35 cents per share, approximately 50% lower than the previous guidance of a range of $0.56-$0.64 cents in GAAP earnings per share.

Amended Class Action Complaint for Violation of the Federal Securities Laws

62.     Defendants announced that "investors should not rely on our previous full fiscal year 2020 guidance issued on May 22, 2019." Defendants announced that rather than the earlier low-single digit revenue growth for fiscal year 2020 over fiscal year 2019, they were now projecting a 5%-10% decrease in 2020 revenues from 2019 revenues.

63.     During the subsequent August 1 Call, Defendant Kurian repeatedly stated, in scripted comments, that two thirds of the revenue miss was attributable to "macro concerns at our largest customers," who were greatly reducing their purchases and instituting longer decision cycles. Kurian added that the miss was largely due to "a meaningful deceleration in overall IT hardware spending due to growing macro uncertainties."

64.     Defendant Kurian further stated that "[w]e were largely on track to meet our guidance until the second half of the quarter. We then saw a deterioration in our close rates against the pipeline with deals getting both pushed out or downsized especially in our largest global customers and the Americas."

65.     Kurian also stated, in scripted remarks, that [b]ecause of our reliance on some of these very large accounts, we may be more susceptible to the slowdown in spending related to the macro."

66.     On this news, NetApp's share price dropped $11.67, over 20%, falling from $57.71 to $46.04, on significantly high trading volume.

67.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

68.     During the Class Period several Defendants and NetApp executives sold suspiciously high amounts of their NetApp stock holdings, evidencing their knowledge that NetApp would fall materially short of its forecasts and that the

Amended Class Action Complaint for Violation of the Federal Securities Laws

stock would drop when the bad news was eventually announced, and thus evidencing their scienter.[2]

69.     On June 3, 2019, Defendant Pasek sold 58,052 shares at a weighted average price of $58.49. Defendant Pasek received $3,395,432 in proceeds from these sales. The shares sold represented over 43% of Pasek's NetApp holdings.

70.     On June 3, 2019, Defendant Fawcett sold 11,195 of his NetApp shares at a weighted average price of $58.76. Defendant Fawcett received $657,855 in proceeds from the June 3 sales. On June 21, 2019, Defendant Fawcett sold an additional 38,195 shares at a weighted average price of $61.55. Defendant Fawcett received $2,390,195 in proceeds from the June 21 sales. In total, during the Class Period Fawcett received $3,048,050 in proceeds from his sale of NetApp stock. The shares sold represented over 56% of Fawcett's NetApp holdings.

71.     On June 4, 2019, NetApp's Executive Vice President for Product Operations Joel Reich sold 30,000 of his NetApp shares at a weighted average price of $60.59. Reich received $1,817,742 in proceeds from the June 4 sales. On June 18, 2019, Reich sold an additional 23,650 shares at a weighted average price of $61.49. Reich received $1,454,302 in proceeds from the June 18 sales. In total, during the Class Period Reich received $3,272,044 in proceeds from his sale of NetApp stock. The shares sold represented 77% of Reich's NetApp holdings.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of NetApp during the Class Period (the "Class"); and were damaged upon the revelation of the alleged

---

[2] This section includes only discretionary stock sales. It excludes all stock sales during the Class Period which the Company contemporaneously announced in Form 4 filings were intended to offset a tax burden created by the vesting of restricted stock units. Also excluded are any sales made pursuant to a 10b5-1 plan.

Amended Class Action Complaint for Violation of the Federal Securities Laws

corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company and of RBSM, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of NetApp;

Amended Class Action Complaint for Violation of the Federal Securities Laws

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused NetApp to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether the NetApp Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of NetApp's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

78.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     throughout the Class Period, the Company's securities are traded in an efficient market;

Amended Class Action Complaint for Violation of the Federal Securities Laws

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, a highly efficient and automated market, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

79.     Based upon the foregoing, the market for NetApp's securities promptly digested current information regarding NetApp from all publicly available sources and reflected such information in NetApp's stock price. Under these circumstances, all purchasers of NetApp's securities during the Class Period suffered similar injury through their purchase of NetApp's securities at artificially inflated prices and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

80.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **<u>NO SAFE HARBOR</u>**

Amended Class Action Complaint for Violation of the Federal Securities Laws

81.   NetApp's "Safe Harbor" warnings accompanying its reportedly forward-looking guidance statements issued during the Class Period were ineffective to shield whose statements from liability. There were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NetApp who knew that the statement was false when made.

82.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the non-forward-looking statements alleged as false in this Complaint. Those statements relate to then-existing facts and conditions.

## COUNT I

**Violation of Section 10(b) of The Exchange Act
and Rule 10b-5 Promulgated Thereunder
<u>Against All Defendants</u>**

83.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.   During the Class Period, NetApp and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the

Amended Class Action Complaint for Violation of the Federal Securities Laws

false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and omitted material facts.

86.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

87.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material information; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Defendants' knowledge and control. As the senior managers and/or directors of NetApp, the Individual Defendants had knowledge of the details of NetApp's internal affairs.

88.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity

of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

89.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or on the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions.

90.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

91.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

92.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

Amended Class Action Complaint for Violation of the Federal Securities Laws

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

93.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of NetApp's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial position and business practices.

95.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by NetApp which had become materially false or misleading.

96.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NetApp disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NetApp to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NetApp's securities.

97.    Each of the Individual Defendants, therefore, acted as a controlling person of NetApp. By reason of their senior management positions and/or being directors of NetApp, each of the Individual Defendants had the power to direct the

- 26 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

actions of, and exercised the same, to cause NetApp to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of NetApp and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

98. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

Amended Class Action Complaint for Violation of the Federal Securities Laws

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2020           Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg, *pro hac vice*
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

Amended Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2020, I electronically filed the foregoing *Amended Class Action Complaint for Violation of the Federal Securities Laws* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Gonen Haklay*
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: ghaklay@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***

Amended Class Action Complaint for Violation of the Federal Securities Laws