**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD C. SMITH, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NETAPP, INC., et al.<br><br>Defendants. | Case No. 4:19-cv-04801-JST<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: July 15, 2020<br>Time: 2:00 p.m.<br>Courtroom: 6<br>Hon. Jon S. Tigar |

# TABLE OF CONTENTS

I.  STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3)) ............................................... 1

II.  INTRODUCTION ........................................................................................... 1

III.  STATEMENT OF FACTS ................................................................................. 2

IV.  ARGUMENT ................................................................................................... 5

    A.  Legal Standard For Evaluating a Rule 12(b)(6) Motion ............................... 5

    B.  The Court Should Not Consider Defendants' Alternate Universe of Facts at the Pleading Stage ...................................................................................... 6

    C.  The Complaint Adequately Alleges Falsity ................................................. 9

      1.  The Complaint Adequately Alleges the Falsity of the Risk Warning in the June 18, 2019 10-K ............................................................................. 9

      2.  The Complaint Adequately Alleges that the May 22, 2019 Revenue Projection was False and its Cautionary Statements were Not Meaningful 15

    D.  The Complaint Adequately Alleges Scienter ............................................. 19

      1.  Legal Standard .................................................................................. 19

      2.  The Complaint Adequately Alleges A Strong Inference of Fraudulent Intent for the 2019 10-K Risk Warning ................................................ 19

      3.  The Complaint Adequately Pleads Scienter as Defendants Knew that their May 22, 2019 Forecast was False when they Issued it .............................. 23

    E.  The Complaint Adequately Alleges a Section 20(a) Violation ................... 23

V.  CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................................................5

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)...............................................................................................10, 11

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) .....................................................................................12

*City of Ann Arbor Employees' Retirement System v. Sonoco Products Co.*,
  827 F. Supp. 2d 559 (D.S.C. 2011) ..........................................................................................18

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)....................................................................................................15

*Epstein v. World Acceptance Corp.*,
  No. 6:14-CV-01606-MGL, 2015 WL 2365701 (D.S.C. May 18, 2015) ....................................9

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995)...............................................................................................15, 22

*Flynn v. Sientra, Inc.*,
  No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ........................10, 11

*Freeland v. Iridium World Commc'ns, Ltd.*,
  545 F. Supp. 2d 59 (D.D.C. 2008) ...........................................................................................18

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000)...................................................................................................22

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)......................................................................................................15

*In re AT&T Corp. Sec. Litig.*,
  No. CIV. 00-CV5364(GEB), 2002 WL 31190863 (D.N.J. Jan. 30, 2002) ...............................15

*In re Cell Therapeutics, Inc. Class Action Litig.*,
  No. 2:10-CV-00414-MJP, 2011 WL 444676 (W.D. Wash. Feb. 4, 2011) ...................................7

*In re CV Scis., Inc. Sec. Litig.*,
  No. 218CV01602JADBNW, 2019 WL 6718086 (D. Nev. Dec. 10, 2019)...............................20

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005)..............................................................................19, 21, 23

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015)......................................................................................21

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015)....................................................................................18

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................................19, 20

*In re Nash Finch Co.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) ..................................................................................18

*In re Omnivision Techs., Inc.*,
   No. C-04-2297 SC, 2005 WL 1867717 (N.D. Cal. July 29, 2005).............................................22

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)..............................................................................................11

*In re Read-Rite Corp.*,
   335 F.3d 843 (9th Cir. 2003).................................................................................................10

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003).........................................................................16, 17, 18

*In re Silver Wheaton Corp. Sec. Litig.*,
   No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ...........................21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012).................................................................................................19

*In re Veritas Software Corp. Sec. Litig.*,
   No. 04-831-SLR, 2006 WL 1431209 (D. Del. May 23, 2006) .................................................15

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018).......................................................................................6, 7, 9, 13

*Lopes v. Fitbit, Inc.*,
   No. 18-CV-06665-JST, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) ...................................10

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008).............................................................................................13, 15

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
   No. 619CV619ORL40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020)............................11

- iii -

---

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)................................................................................................17

*Paddock v. Dreamworks Animation SKG, Inc.*,
  No. CV 14-06053 SJO (EX), 2015 WL 12711653 (C.D. Cal. Apr. 1, 2015) ...........................7

*Philco Investments, Ltd. v. Martin*, No. C,
  10-02785 CRB, 2011 WL 4595247 (N.D. Cal. Oct. 4, 2011)....................................................7

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*, No. 1:08-CV-02940-JOF,
  2011 WL 13124501 (N.D. Ga. Mar. 17, 2011)..........................................................................9

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016)................................................................................................8, 12

*Schulein v. Petroleum Dev. Corp.*,
  No. SACV111891AGANX, 2012 WL 12884851 (C.D. Cal. June 25, 2012)...........................17

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009)................................................................................................10

*Slayton v. American Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................................18

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)..............................................................................................19, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................5, 15, 19

*Wieland v. Stone Energy Corp.*,
  No. CIV.A. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007) ......................................23

*Wochos v. Tesla, Inc.*,
  No. 17-cv-05828-CRB WL 4076437 (N.D. Cal. Aug. 27, 2018) ............................................23

*Yanek v. Staar Surgical Co.*,
  388 F. Supp. 2d 1110 (C.D. Cal. 2005)................................................................................5, 18

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)...................................................................................................23

**Statutes**

15 U.S.C. § 78u-4 ......................................................................................................................15

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## I.    STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3))

Does the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint" or "¶__") state a claim for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against Defendants NetApp, Inc. ("NetApp" or "Company"), George Kurian, Ronald Pasek, and Matthew Fawcett? Does the Complaint state a claim for "controlling person" liability under Section 20(a) of the Exchange Act against Defendants Kurian, Pasek, and Fawcett?

## II.    INTRODUCTION

On August 1, 2019, Defendant announced "preliminary results" for the first quarter of fiscal year 2020 ("Q1 2020"), ended July 26, 2019. In a conference call that day, Defendants admitted that, by the time they had filed with the SEC their Annual Report on Form 10-K for the year ended April 26, 2019 ("2019 10-K"), NetApp's largest customers had materially reduced and delayed purchases. Defendants admitted that they "saw a deterioration in [NetApp's] close rate against the pipeline" relating to "macroeconomic uncertainties" for NetApp's largest clients.

Nevertheless, when Defendants filed the 2019 10-K on June 18, 2019, during the second half of Q1 2020, they warned only of the risk that their largest customers *might* materially reduce their spending and lengthen their decision cycles for Q1 2020, omitting that the risk had *already* materialized. Having warned of the risk, Defendants were duty-bound to disclose that it had materialized. Defendants also violated both Generally Accepted Accounting Principles ("GAAP") and SEC regulations, imposing on them the duty to disclose nonrecognized subsequent events that rendered their previous and current statements materially false. Defendants' reckless failure to carry out their duty misled investors in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Further, earlier, on May 22, 2019, almost a month into the first quarter of Fiscal Year 2020 ("Q1 2020"), Defendants predicted growth in revenue even as they took into account factors they knew had previously negatively impacted the Company's financial condition. Defendants

- 1 -

reassured investors that NetApp was "very very close to" their largest enterprise customers, had "a lot of access" to them, and had great "visibility" into any changes in those customers' spending decisions. Because of these relationships with the Company's customers, Defendants knew the risk that their largest customers would reduce and push out their purchases had materialized, and their forecast was false when they issued it.

On August 1, 2019, NetApp admitted that it had missed its first quarter guidance by up to $243 million. Shocked investors bid NetApp's stock price down over 20 percent, and investors lost millions of dollars.

Knowing what investors did not, several of NetApp's executives, including two of the named Defendants, took advantage. During the Class Period,[1] the executives sold suspicious amounts of their NetApp holdings, garnering millions of dollars.

Considered holistically, the pleading adequately raises a strong inference of Defendants' scienter in recklessly conveying a false risk warning on June 18, 2019, declining to tell investors vital information they were duty-bound to reveal, rendering their risk warning materially misleading. The pleading further adequately alleges that Defendants knowingly issued a false forecast at the start of the Class Period. This Court should deny Defendants' motion to dismiss in its entirety.

## III.    STATEMENT OF FACTS

NetApp concentrates primarily on cloud data services, private cloud, and storage markets. ¶21. In fiscal year ("FY") 2019, which ended on April 26, 2019, NetApp earned a majority of its revenue in the Americas. ¶¶2 n.1, 21, 23. In 2019, NetApp earned a majority of its revenue through its largest customers, known as "enterprise" customers, such as distributors, rather than through its own sales force. ¶22. In FY 2019 just two such distributors, purchasing largely from NetApp's storage segment, accounted for 44% of NetApp's sales. ¶¶22-23. NetApp's financial success is dependent on a small number of these large, enterprise customers, more so than its

---

[1] The Class Period is from May 23, 2019 to August 1, 2019, both dates inclusive.

competitors' financial success, and a downturn or negative change in the spending or decision cycles of enterprise customers negatively affects NetApp's bottom line more than those of its competitors. ¶23.

Before the Class Period and since, Defendants have boasted of their close relationships with and visibility into the spending of NetApp's biggest customers. ¶24. Defendants describe NetApp's relationships with its largest customers as "very, very close," allowing for "a lot of access" to the customers and the sales channel. ¶24. Their visibility into its customers' spending patterns, Defendants stated, is greater than that of its competitors. ¶24. Defendant Kurian stated that this great visibility gives NetApp the ability to foresee significant changes in their largest customers' spending patterns. ¶24. NetApp boasted that it is "able to see the visibility on any turn [in spending patterns] faster than most people." ¶24. Because of its reliance on its largest customers, NetApp is "more susceptible to the slowdown in spending related to the macro[economic issues]" than its competitors. ¶65.

Defendants have told investors that they could pinpoint a material change in NetApp's enterprise customer purchasing as it was occurring, including amidst a general industry slowdown, and boasted that they could quickly discern the reasons for any changes in purchasing trends by their largest customers. ¶27. For example, Defendants had earlier told investors that they had recognized with respect to a slowdown in purchasing by enterprise customers that "things changed materially through the last week of December [2018] and really January." ¶27.

Around the start of calendar year 2019, NetApp told investors that macroeconomic issues, including U.S.-China trade disputes, "material[ly] impacted" its largest customers' spending and that the deceleration was "steady." The deceleration, Defendants stated, would impact NetApp's FY 2020 results. ¶¶25-29.

NetApp's FY 2020 began on April 27, 2019. ¶32. In a May 22, 2019, press release that NetApp attached to a Form 8-K, Defendants discussed NetApp's financial results for the fourth quarter and full FY 2019. ¶¶13, 32. Those results revealed a revenue shortfall relative to expectations, both quarterly and for full FY 2019. ¶34.

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Also on May 22, after the close of market, NetApp convened a conference call ("May 22 Call"), ¶21, at which Defendants Kurian and Pasek spoke with investors. ¶33. Defendants acknowledged that, 26 days into the first quarter of FY 2020, customer spending behavior had not improved. ¶35. During the call, an analyst noted that NetApp's forecasts for the past six months had not been met, and then stated that "it seems like your enterprise customers have already upgraded what they need to upgrade." ¶31. Responding, Defendant Kurian did not disagree. ¶31.

Despite noting that they were long aware of disappointing results and macroeconomic issues, Defendants, having already considered the "material impact" of the macroeconomic factors, and having assured investors of their visibility into their customers' spending ¶¶25-29, forecast year-over-year FY 2020 revenues higher than in 2019, with 1% year-over-year growth. ¶¶24, 36-37. Defendants further forecast a year-over-year increase in Q1 2020 revenues, with guidance of between $1.315 and $1.465 billion, and first quarter 2020 GAAP earnings per share of between $0.56 and $0.64 cents. ¶36.

On June 18, 2019, well into the second half of Q1 2020, Defendants filed NetApp's 2019 10-K. ¶40. The 2019 10-K includes a risk warning cautioning, in part, that "a loss, cancellation or delay in purchases by [large enterprise customers, resellers and distributors,] has negatively affected our revenues in the past, and could negatively affect our revenues in the future." ¶40. The 2019 10-K's financial statements contains a "Subsequent Events" section at Note 19. ¶44. In Note 19, Defendants revealed events that had occurred during the first quarter of FY 2020, subsequent to the last time it had spoken to investors, but did not mention the observed deterioration in the buying practices of NetApp's enterprise customers in June. ¶¶44-45.

The 2019 10-K was signed by Defendants Kurian and Pasek, who also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attached as exhibits to the 2019 10-K. ¶¶11-12, 18. ¶¶10-11.

On August 1, 2019, during a conference call to pre-announce results for Q1 2020 ("August 1 Call"), Defendant Kurian admitted that no later than the second half of Q1 2020

enterprise customer sales had deteriorated as NetApp failed to close deals with its largest customers. ¶¶41, 64. On that same date, Defendants filed an 8-K, signed by Defendant Fawcett, with preliminary first quarter 2020 fiscal results. ¶58. Defendants announced that they would materially underperform the Q1 2020 guidance range issued on May 22, 2019, and that first quarter revenues would be $243 million lower than the upper range of the projection. ¶¶59-60. Defendants further announced that first quarter 2020 GAAP earnings per share would be approximately 50% lower than forecasted. ¶61. Defendants told investors that they should not rely on the full FY 2020 guidance issued on May 22, 2019, and that they believed FY 2020 revenues would decrease 5-10% from FY 2019 revenues, and not grow as NetApp had projected. ¶62. On this news, NetApp's share price dropped $11.67, over 20%, falling from $57.71 to $46.04, on relatively high trading volume. ¶66.

With knowledge that enterprise sales had materially flagged, during the Class Period, Defendant Pasek sold over 43% of his NetApp holdings for proceeds of $3,395,432. ¶69. During the Class Period, Defendant Fawcett made discretionary sales of approximately 50% of his NetApp holdings, garnering proceeds of $2,390,195. ¶70.[2] During the Class Period, NetApp's Executive Vice President for Product Operations, Joel Reich, sold approximately 77% of his NetApp holdings, garnering proceeds of $3,272,044. ¶71.

## IV.    ARGUMENT

### A.    Legal Standard For Evaluating a Rule 12(b)(6) Motion

The Court must accept all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), drawing all reasonable inferences from the allegations in the light most favorable to Lead Plaintiff. *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005). The Complaint's allegations must "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted), allowing

[2] Defendant Fawcett's discretionary sale of almost 50% of his NetApp holdings on June 21, 2019, during the Class Period, described above and in ¶70, does not include his June 3, 2019 sales that were made pursuant to a 10b5-1 plan. ¶70.

the court "to draw the reasonable inference that the defendant is liable." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation and internal punctuation omitted).

**B.     The Court Should Not Consider Defendants' Alternate Universe of Facts at the Pleading Stage**

In this straightforward case, rather than confront their admissions, Defendants distract, submitting reams of paper to bury the Complaint's allegations in an alternate factual universe. In *Khoja v. Orexigen Therapeutics*, reversing a dismissal, and citing a "concerning pattern in securities cases" of the "unscrupulous use of extrinsic documents to resolve competing theories," the Ninth Circuit criticized defendants' and district courts' reliance on statements in extrinsic documents for the truth of the matter. Condemning defendants' attempts "to create their own version of the facts at the pleading stage," the Court noted that accepting such "facts" at the pleading stage "risks premature dismissals of plausible claims that may turn out to be valid after discovery." 899 F.3d at 998 (9th Cir. 2018).

Without claiming in any way whatsoever that the Complaint misquotes or otherwise misses context from the documents to which it refers and the quotes therefrom, Defendants seek judicial notice of fourteen exhibits. *See* Declaration of Cheryl W. Foung in Support of Defendants' Motion to Dismiss Class Action Complaint ("Foung Decl.") (Dkt. No. 43). Defendants cite to these documents 58 times in their brief. Certainly, this Court may take judicial notice that Defendants filed the documents they submit. Defendants, however, provide no reason for offering them. As Defendants acknowledge, this Court may not consider statements in judicially noticed documents, statements not cited in the Complaint, for their truth. *See* Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss Amended Class Action Complaint ("RJN") (Dkt. No. 44) at 4 n.7, (judicially noticed documents may only be evaluated "for the sole purpose of determining what representations [defendant] made" and the court "is not taking notice of the truth of the facts asserted," *quoting Wochos v. Tesla, Inc.*, No. 17-cv-05828-CRB WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (citing to *Orexigen*, 899 F.3d at 999-1000).

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Despite acknowledging this black letter law, Defendants ask the Court to consider statements in judicially noticed documents for their truth anyway. Defendants rely on *Philco Investments, Ltd. v. Martin*, No. C 10-02785 CRB, 2011 WL 4595247, at *7 (N.D. Cal. Oct. 4, 2011), *see* RJN at 3, for the proposition that the Court need "need not accept as true [Plaintiffs'] allegations … that are contradicted by incorporated materials." RJN at 3. *Philco* is inapposite. In *Philco*, plaintiffs cited to a source document in support of an allegation in the complaint, but the language in the exact citation was inconsistent with its description in the complaint, *i.e.*, a document spot cited in a complaint did not say what the complained alleged it did. *Philco,* 2011 WL 4595247, at *7. Here, Defendants assert no contradiction, no missing context, no error in a quotation that would render the documents they submit relevant. *Philco* offers no support for Defendants' submissions and certainly does not permit any court to ignore the Complaint's well-pleaded allegations or to refuse to accept them as true at the pleading stage.

Similarly, Defendants' citation to *Paddock v. Dreamworks Animation SKG, Inc.*, No. CV 14-06053 SJO (EX), 2015 WL 12711653, at *5 (C.D. Cal. Apr. 1, 2015), *see* RJN at 3, for the proposition that the Court may consider quotes from judicially noticed materials to undermine the allegations, ignores the distinguishing facts of that case and flies in the face of the Ninth Circuit's ruling in *Orexigen*, condemning this exact practice. 899 F.3d at 998. In *Dreamworks*, the court held that plaintiff "misconstrued" the allegedly false statements by citing to only half of several sentences, and that reading each entire single sentence made plain that the cited halves were not as conclusory as plaintiff asserted. *Id.* at 5. Here, Defendants do not claim that the Complaint misconstrues the meaning of the quotations it includes, or that it omits half-sentences, changing the meaning of citations to Defendants' own words.

Defendants do not challenge loss causation or mention damages. Nevertheless, they refer to NetApp's stock prices more than five and eight months after the start of the Class Period, with no citation to any case showing relevance. *See* Defendants' Brief at 5; Ex. 14 to the Foung Declaration (Dkt. No 43-14). Nor can they argue relevance. *See,* e.g., *In re Cell Therapeutics, Inc. Class Action Litig.*, No. 2:10-CV-00414-MJP, 2011 WL 444676, at *6 (W.D. Wash. Feb. 4,

2011) (price fluctuations after initial drop does "not invalidate loss causation"). Defendants offer no law suggesting that this Court should consider or, worse, rely upon the information they have submitted, notwithstanding that technically, the Court may take judicial notice of those documents. Their attempt to place facts before this Court for the irrelevant proposition that "look, it got better later," is exactly the type of "unscrupulous" behavior which the *Orexigen* court condemned. Indeed, the securities laws view claims ex ante. Just as Plaintiffs cannot plead fraud by hindsight, Defendants cannot self-exculpate, asserting that everything turned out okay. *See Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 703, 707 (9th Cir. 2016) (the FDA's ultimately approving a drug did not license Defendants to lie about material adverse facts during the course of the approval process). The citations to Ex. 14 are irrelevant to a consideration of either the falsity of or scienter for the May 22 or June 18 challenged statements, and the Court should not consider the contents of that exhibit, even if they are accurate.

Defendants deploy filed documents in ways that do not parry or place in context any statements cited in the Complaint. For example, Defendants cite to NetApp's February 19, 2019 10-Q eleven times, and include extensive quotes from the document to show that they had earlier warned about risks related to enterprise customers' spending patterns. *See* Defendants' Brief ("D. Br.") at 4, 12-14.[3] Not only may the Court not take the statements Defendants specifically cite to from that document for their truth, but the fact that Defendants had warned earlier about risks from changes in their largest customers' spending does not undermine the Complaint's allegation that having done so again on June 18, 2019, Defendants were duty-bound to state that the risk had materialized by that date. Defendants' statements in February of 2019 do not immunize their materially misleading June 18 risk warning from being actionable.

Similarly, defendants cite to their Exhibit 7, the August 14 earnings call ("August 14 Call") to discuss certain financial results or Company segments about which the Complaint is silent. *See*, e.g., D. Br. at 5 ("the news was not all negative"). The citations do not offer context,

---

[3] Plaintiffs only cite to the February 19, 2019 10-Q once, to note that Defendant Kurian signed it. ¶11.

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

correct a quotation in the Complaint, or alert that the truth of the materialization of the risk by June 18, 2019 was on the market.

Finally, Defendants cite to the transcript of the August 14 Call to demonstrate that NetApp purchased stock during Q1 2020, exactly as it had previously planned to. D. Br. at 21. Defendants ask this Court to infer facts against the Complaint at this stage, and they may not do so. *See Epstein v. World Acceptance Corp.*, No. 6:14-CV-01606-MGL, 2015 WL 2365701, at *1 (D.S.C. May 18, 2015). The Complaint does not cite to this transcript for any discussion of NetApp's own stock repurchases, either directly or indirectly. Nor does Plaintiff discuss this topic anywhere in his Complaint. Plaintiff makes no claim about Defendants' cash on hand anywhere in the Complaint, and there could be multiple reasons why NetApp went ahead with this repurchase. In fact, the repurchase of stock means that there are fewer shares of stock outstanding, and positively impacts share price. Defendants' citation fails to state when exactly the repurchase occurred, and depending on when it did, the repurchase might support a finding of scienter. *See Plymouth Cty. Ret. Sys. v. Carter's Inc.*, No. 1:08-CV-02940-JOF, 2011 WL 13124501, at *29 (N.D. Ga. Mar. 17, 2011) (stock repurchase may contribute to strong inference of scienter because it might raise stock price, and/or when in close proximity to insider stock sales). That Defendants repurchased stock says nothing about whether they recklessly made a false statement failing to disclose that a risk warning had materialized in the 2019 10-K, or about whether they knowingly issued a false forecast on May 22, 2019. This citation is included only to present an alternative version of facts, and Defendants are not entitled to do so at the pleading stage. *Orexigen,* 899 F.3d at 998.

### C.       The Complaint Adequately Alleges Falsity

#### 1.       The Complaint Adequately Alleges the Falsity of the Risk Warning in the June 18, 2019 10-K

The June 18, 2019 10-K was materially false for failing to state that as of its filing the risk of enterprise customers reducing and delaying purchases had materialized. Risk warnings are actionable as material misrepresentations when the warning speaks to "entirely… as-yet-

- 9 -

unrealized risks and contingencies" and fails to alert "the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *see also Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *10–11 (C.D. Cal. June 9, 2016); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("By choosing to speak about the [topic] Defendants assumed a duty to disclose material information" about it), *aff'd*, 563 U.S. 27.

The 2019 10-K cautioned that if enterprise customers cancelled or delayed large, recurring purchases, NetApp's financial results could suffer materially. ¶40. That risk, Defendants admitted on August 1, had materialized by the second half of Q1 2020, when Defendants caused NetApp to file the 2019 10-K, as Defendants had seen "a deterioration in our close rates against the pipeline with deals getting both pushed out or downsized especially in our largest global customers and the Americas." ¶64.[4] Kurian further noted that NetApp reli[ed] on these very large accounts." ¶65. By the time NetApp filed the 2019 10-K, NetApp was well-past the mid-point of its Q1 2020. That is, the Complaint pleads—and Defendants cannot parry—that the risk had already materialized at the time they filed the 2019 10-K. That Defendants boasted about their "very, very close" relationships with NetApp's largest customers, of their superior visibility into their customers' spending patterns compared to their competitors, and their ability to foresee significant changes in their largest customers' spending patterns quickly, ¶24, strengthens the strong inference.[5] Having warned investors that large deals getting pushed out,

[4] "A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) (citation omitted), *abrogated on other grounds by South Ferry*, 542 F.3d at 784. *See also Lopes v. Fitbit, Inc.*, No. 18-CV-06665-JST, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020) (an after-the-fact statement that "contradicts the substance of an earlier statement and essentially states 'I knew it all along'" is an admission) (citation omitted).

[5] Defendants' contention that Plaintiff fails to plead facts substantiating NetApp's visibility, D. Br. at 20, is wrong. The Complaint quotes Defendant Kurian's exact words during a specific call admitting as much. *See* ¶24.

- 10 -

cancelled, or reduced in size "has negatively affected our revenues in the past, and could negatively affect our revenues in the future," Defendants were duty-bound to inform investors that those adverse conditions existed as of that moment, and that the risk had materialized. None of the 14 documents Defendants attach to their motion contradicts the well-pleaded allegation that quotes Defendant Kurian's own words from the August 1 Call. *See* ¶64. *See also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (reversing dismissal, Ninth Circuit found liability where Defendants misled about the state of their pipeline).

In *Sientra*, 2016 WL 3360676, (C.D. Cal. June 9, 2016), finding falsity and scienter, the court held that though defendants warned generally about risks of product contamination in production facilities, similar to Defendants' general warnings here, they "knew or recklessly disregarded" that the risk had specifically materialized, and thus breached their duty to disclose. 2016 WL 3360676, at *10–11. In *Berson, 527 F.3d at 986*, defendants were found liable where they warned of hypothetical risks relating to their "backlog" when they knew the risk had materialized in part. In *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2020 WL 1072582, at *6 (M.D. Fla. Feb. 14, 2020), the court ruled that risk warnings stating that the stock price may experience "wide fluctuations" due to "factors unconnected to the Company's performance" were materially misleading where defendants failed to disclose that they were actively manipulating the stock's price.

These cases are directly on point. While Defendants here warned of the material risk to NetApp's financial results from changes in its largest customers' buying patterns, having seen that risk materialize, their warning of this risk bound them to inform investors of its materialization. Defendants' recklessly issued risk warning misrepresented the state of affairs, rendering it materially false and actionable. Nor does it matter whether the materialization was due to macroeconomic concerns or poor sales execution in the Americas. The risk warning warned of numerous risks that might impact customers' spending practices. Defendants saw what had and was happening, and were duty-bound to tell investors.

- 11 -

Improperly conflating forecast and risk warning, Defendants argue that the risk warning could not be false unless the Complaint pleaded that by June 18 NetApp knew that it would materially miss its Q1 2020 projection. D. Br. at 16. Defendants miss the point entirely, ignoring well-settled Ninth Circuit precedent. The risk warning is not false because it meant Defendants knew that they would not reach a future revenue goal (even as that was likely what they surmised, *see* ¶41(a)). Indeed, even if the sales landscape improved after June 18 and Defendants could have achieved their forecast Defendants' false risk warning would remain actionably false, as courts in this Circuit evaluate securities fraud claims *ex ante* and not *ex post*. In *Arena Pharma.*, 840 F.3d at 708, reversing dismissal, the Ninth Circuit ruled that even though the drug at issue was eventually approved by the FDA, Arena could not "claim [during the approval process] that all of the data was running in lorcaresin's favor. It was not." Similarly here, it did not matter whether Defendants believed they would or would not reach their Q1 2020 forecast. They could not publish a materially false risk warning without revealing information showing that the risk had already materialized.

The risk warning is false because by June 18 Defendants knew that a risk concerning their most important customers, whose spending could materially affect NetApp's financial results, ¶23, had materialized. ¶¶40, 41(b). Defendants knew weeks earlier that enterprise customer spending behavior had deteriorated materially since the start of Q1 2020 to May 22, 2019, when the forecast was issued. ¶35. It does not matter whether the May 22 revenue projection was "conservative" or not, D. Br. at 16, as the falsity of the risk warning is not connected to any forward-looking statement, but to Defendants' knowledge, proven through their own words, *see* ¶64, that a warned-about risk had specifically materialized. Defendants' citation to *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 929–932 (N.D. Cal. 2017), *see* D. Br. at 17, is inapposite. The cited pages discuss whether plaintiff adequately alleged that defendants knew their quarterly revenue guidance was false when made. That discussion of the falsity of a forward-looking statement is irrelevant to a discussion of whether, in the context of a duty to

- 12 -

disclose materialization of a risk about which Defendants themselves warned, the Complaint adequately alleges that at that time the risk had materialized. The Complaint adequately alleges materialization, and Defendants failure to inform investors that the risk had materialized from the possible to the actual is actionable.

Defendants further point to general risk language in other SEC filings they attach that bookings are generally weighted toward the back end of quarters, and that this is "undisputed." D. Br. at 4 n.3, 23. This claim does not weaken the falsity inference. What happens "generally" is irrelevant when Defendants have specifically admitted that they actually saw the deterioration happening not at the end of the second half of Q1 2020, but by the second half of Q1 2020, which began on June 10, 2019. The Complaint well-pleads Defendants' admission. ¶64. In fact, Defendants' claim here exemplifies the actions condemned by the Ninth Circuit in *Orexigen*, 899 F.3d at 998. Failing to counter the specific well-pleaded allegations about what existed on June 18, 2019, Defendants instead create an alternate universe of facts that they ask this Court to accept for its truth, namely that in other financial quarters, Defendants had observed something different. Defendants' argument does not undermine that fact that the Complaint pleads that by June 18 Defendants knew that material sales had not and would not close in Q1 2020. *See* ¶64.

Further, even if Defendants thought on June 18, in the face of the headwinds it admits to seeing, that the Company would somehow achieve its forecast, that does not excuse its failure to issue an accurate risk warning including the fact that they knew that the risk had already materialized. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("the fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.") (citation omitted).

GAAP and SEC reporting obligations further bolster Defendants' duty to disclose materialization of the risk. Under GAAP, the materialized risk was a "nonrecognized subsequent

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

event" under ASC 855-10-20. ¶¶54-57. That NetApp's most important customers, whose buying behavior materially impacts the Company's financial condition, ¶¶23, 40, had cancelled or delayed material purchases, actions that NetApp warned could negatively affect its financial results, was material information that GAAP required Defendants to tell the market. ¶55. Defendants' failure to do so rendered their financial statements materially misleading.

Defendants' failure to follow Item 303 of Regulation S-K's mandate to disclose known trends further supports Defendants' liability. ¶¶42-48. Defendants knew they needed to do so in the "Subsequent Events" Note in their 10-K, as they indeed did so on another subject. ¶45. Even as Item 303 cannot itself be the basis for a Section 10(b) violation in this Circuit, Defendants' behavior showing that they understand its mandate supports a finding of reckless behavior and falsity with respect to their failure to carry out their otherwise-mandated duty. Further, Defendants' argument that Item 303 does not require the disclosure of forward-looking information is inapposite. *See* D. Br. at 18. Plaintiff has alleged that the 2019 10-K was materially misleading because Defendants did not disclose an existing known trend, not "forward-looking information." Item 303(a)(3) does not apply only to trends that will in the future have a material unfavorable impact on revenues, but also those that "have had" such an impact. ¶43.

As of June 18, 2019, Defendants knew that enterprise sales had materially deteriorated even as they presented that then-current fact as merely a risk. Defendants must concede that if the Complaint adequately pleads that the sales pipeline was materially deteriorating by the time they filed the 2019 10-K, and that Defendants did not reveal that the risk had materialized, then the Court should deny the motion to dismiss. The Complaint adequately alleges falsity in Defendants' failure to disclose the materialization of the risk in the 2019 10-K.

###### 2.   The Complaint Adequately Alleges that the May 22, 2019 Revenue Projection was False and its Cautionary Statements were Not Meaningful

The PSLRA "safe harbor," 15 U.S.C. § 78u-4, immunizes from liability forward-looking statements that are "identified as a forward-looking statement, and ... accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." The second prong of the safe harbor states that the provision is inapplicable to a material statement "made with 'actual knowledge' that it was false and misleading." *Id.* The safe harbor provision, therefore, "does not afford corporations a free pass to lie to investors." *In re AT&T Corp. Sec. Litig.*, No. CIV. 00-CV5364(GEB), 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), *overruled, in part, on other grounds*, *Tellabs, Inc.*, 551 U.S. 308). As a matter of law, no court in this Circuit or elsewhere has ever sanctioned issuers and their agents issuing knowingly false financial forecasts. *See, e.g.*, *In re Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 WL 1431209, at *7 (D. Del. May 23, 2006) ("No manner of cautionary language can cure false statements knowingly made.").

The optimistic May 22, 2019 revenue guidance, projecting a Q1 2020 revenue increase and even higher growth for FY 2020, ¶¶36-37, was false when made, and none of Defendants' cautionary statements is meaningful in the face of the knowing misrepresentation. In *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995), defendants made optimistic statements, in mid-January, about an expansion program, and the prospects that the expansion would increase earnings. *Id.* at 1080. By early April the company cancelled the expansion program, and acknowledged a drop in net income, causing a material stock price drop. *Id.* Reversing the district court's dismissal, the Ninth Circuit held the "very short[]" amount of time between the optimistic statements and the decision to terminate the expansion program" was "circumstantial evidence that the optimistic

statements were false when made," especially in the "absence of any indication of an intervening catastrophic event." *Id.* at 1083–84.[6]

*Fecht* is instructive, and the proximity of the events here supports a finding of actual knowledge of falsity. Defendants issued their forecast on May 22, 2019, and admitted that they knew enterprise customer sales were being materially affected by June 10, 2019, the start of the second half of Q1 2020. ¶64. This period of time, less than three weeks, is far shorter than the "very short[]" amount of time between statement and contradictory knowledge found to be circumstantial evidence that statements were knowingly false when made in *Fecht*.

Defendants' knowledge that they were issuing a false forecast is bolstered by the fact that they issued it not at the start of Q1 2020, but almost a full month into the quarter. Defendants knew that NetApp was more reliant for its financial success on these customers than were its competitors, more susceptible to negative effects from the macroeconomic factors than those competitors, ¶65, and were finely attuned to their largest customers' spending practices and trends or changes in those practices. ¶24. By May 22, 2029, Defendants not only knew that macroeconomic factors had, and would again, negatively impact the buying decisions of their largest, enterprise customers, as they had admitted, and that those buying decisions affected the ability to achieve the predicted revenues, ¶¶24-31, but they also knew that enterprise customer spending behavior had not improved since the start of Q1 2020 to May 22, 2019, when the forecast was issued. ¶35.

Indeed, when challenged by a skeptical analyst on May 22, 2019, asserting that NetApp's enterprise customers had already upgraded what they needed to upgrade, Defendants did not specifically disagree, further evidence that they knew that the forecast they issued that very day was false. The strongest and most reasonable inference here is that given their admitted

---

[6] *But see City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (timing of write down may contribute to strong inference of scienter but cannot alone establish scienter (citations and quotation omitted)).

knowledge both before and then after May 22, 2019, Defendants knew on May 22, 2019, that NetApp would not achieve the guidance figures Defendants issued that day. The Complaint adequately pleads that Defendants knew that the May 22, 2019 guidance was false when made.[7]

Defendants argue that the presence of detailed cautionary language renders their forward-looking statements inactionable. The mere presence of *any* cautionary statement, however, does not render their forward-looking statement inactionable. Rather, cautioning of a risk that has already occurred is deceit. Defendants misinterpret the safe harbor, ignoring the adjective "meaningful." To be "meaningful," a cautionary statement cannot state as possibilities events which have, in fact, already occurred. Courts throughout the country have stated that "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Schulein v. Petroleum Dev. Corp.*, No. SACV111891AGANX, 2012 WL 12884851, at *7 (C.D. Cal. June 25, 2012) (citation omitted). Where a potential risk has actually materialized, cautionary statements accompanying forward-looking statements are not "meaningful" and the safe harbor offers a defendant no protection. *See, e.g., No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003) (where strong inference of actual knowledge raised, statements arguably exempted from safe harbor).

*In re SeeBeyond Technologies Corp. Securities Litigation*, 266 F. Supp. 2d 1150, is on point. In that case, plaintiffs claimed that the cautionary statements accompanying a revenue projection were not "meaningful" because the first quarter financial results had already been adversely impacted by customer dissatisfaction with the quality of SeeBeyond's products, *id.* at 1154–55, while the cautions presented the already existing facts only as possibilities. The court agreed, finding that the revenue projection was not entitled to the protection of the safe harbor.

---

[7] *See also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1154 (C.D. Cal. 2003) (denying motion to dismiss, court found knowing falsity of a projection where Defendants had ignored a decline in business).

- 17 -

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The court found that "plaintiff has made sufficient allegations… that the statements in the April 1 press release were false…." *Id.* at 1167. The court further held that "the accompanying cautionary language can only be meaningful if it… at the very least, clearly articulates the reason why [the forward-looking statement] was false or misleading." *Id.* at 1166.[8] Similarly here, NetApp's cautionary statements do not articulate why their forecast was false, and are not meaningful.

*Yanek*, 388 F. Supp. 2d 1110 is also applicable. In *Yanek*, the defendant had issued positive, forward-looking statements about the status of the FDA approval process for its product, even after the FDA had found "significant objectionable conditions" that would significantly delay the approval process. *Id.* at 1119. Despite its failure to mention facts that existed at the time it issued its forward-looking statements, the defendant argued that its cautionary statements, which stated that there were "risks and uncertainties" surrounding "the need to obtain regulatory approval for new products," and that "[t]he FDA approval process is typically lengthy and expensive, and approval is never certain" *id.* at 1123, were meaningful.

Denying the defendants' motion to dismiss, the *Yanek* court held that, considering, as a whole, existing "significant objectionable conditions" that would significantly delay FDA approval, defendant's cautionary statements were not "meaningful." Rather, the cautionary language could not have been meaningful unless it "adequately disclose[d] both the risks involved

---

[8] Cautionary statements about false forward-looking statements are not meaningful if they present the already existing as a mere possibility. *See City of Ann Arbor Employees' Retirement System v. Sonoco Products Co.*, 827 F. Supp. 2d 559, 576 (D.S.C. 2011) ("cautionary language cannot be meaningful when defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false.") (citations omitted); *see also, e.g., In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015) ("materially under-reserved" company's forward-looking statements regarding adequacy of reserves "are not protected by the safe harbor"); *Slayton v. American Express Co.*, 604 F.3d 758, 769-70 (2d Cir. 2010) ("cautionary language that is misleading in light of historical fact cannot be meaningful"); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) (same) (citations omitted); *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 74 (D.D.C. 2008) (same) (citations omitted).

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

and the assumptions upon which the optimistic, forward-looking language is based." *Id.* at 1122–23.

In this case, that which Defendants cautioned as possibility had already occurred by May 22, 2019, rendering the cautionary language meaningless. In these circumstances, the safe harbor protections Defendants claim evaporate, leaving Defendants exposed to liability. The Complaint adequately alleges the falsity of the May 22, 2019 forecast.

### D.      The Complaint Adequately Alleges Scienter

### 1.      Legal Standard

Courts evaluate scienter allegations holistically, avoiding scrutinizing each allegation in isolation. *Tellabs, Inc.*, 551 U.S. at 324. A complaint survives where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference..." *Id.* It is sufficient for plaintiffs to plead "an extreme departure from the standards of ordinary care … that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). A strong inference "need not be irrefutable, *i.e.*, of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs, Inc.*, 551 U.S. at 324. Making statements while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

### 2.      The Complaint Adequately Alleges A Strong Inference of Fraudulent Intent for the 2019 10-K Risk Warning

"[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation omitted).[9] Falsity alone can create a strong inference of scienter when it is shown that the

---

[9] As falsity and scienter can be inferred from the same facts here, the discussion in Section IV.C.1, *supra.*, establishing the falsity of the June 18, 2019 risk warning is incorporated herein.

Defendants had access to the disputed information. *See, e.g., South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). Defendants here do not argue a lack of access to information about the purchasing practices of their largest customers. They brag about their real-time access to and visibility into this information. ¶24. Indeed, it would be "absurd to suggest that management was without knowledge" of this information about their most important customers. *Id.* at 786; *see* ¶¶21-23.

Considered holistically, the Complaint raises a strong inference of scienter with respect to the materialization of the risk of the deterioration of revenue from NetApp's enterprise customers at the time of the 2019 10-K. The Complaint alleges Defendants' own words, admitting their knowledge that material purchases by enterprise customers had been cancelled or delayed by the second half of Q1 2020, ¶65, and thus Defendants knew that the risk warning at issue was materially false on June 18, 2019. As the allegation related to the risk warning is not forward-looking, Plaintiff need only allege recklessness, and this allegation alone suffices to raise a strong inference of scienter. In addition, the scienter inference is strengthened by NetApp's having ignored a duty to disclose the materialization of the risk under GAAP and SEC Regulations, that Defendants understood the importance of the "Subsequent Events" Note in the financial statements but chose not to disclose the materialization of the risk in that Note, and by the insider stock sales.

Defendant Kurian's own words are strong circumstantial evidence of Defendants' reckless failure to abide by their duty to disclose that a hypothetically warned-about risk had materialized. Defendants admit that from the start of the second half of Q1 2020 they saw that enterprise customers were pushing out or cancelling purchases ("largely on track … until the second half of the quarter. We then saw a deterioration …."). ¶64. This is "classic evidence of scienter." In fact, it is even stronger, as it does more than merely "suggest" that the risk warning was materially misleading. Defendants knew facts by June 18 showing that their risk warning had materialized. Defendants *admit* they knew this by the second half of Q1 2020. *Id. See In re Immune Response Securities Litigation*, 375 F. Supp. 2d at 1022 (strong inference of scienter

- 20 -

pleaded where plaintiff knew facts merely "suggest[ing]" Defendants' statements were inaccurate); *In re CV Scis., Inc. Sec. Litig.*, No. 218CV01602JADBNW, 2019 WL 6718086, at *5 (D. Nev. Dec. 10, 2019) (defendants' admitted knowledge of facts contradicting public statements constitutes, at the very least, deliberate recklessness, and evidences their scienter).

Defendants' GAAP violation bolsters the strong inference of scienter. The court in *In re Daou* held that "when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter." 411 F.3d at 1016 (citation omitted). The Complaint pleads with specificity the relevant GAAP provision, ASC 855-10, the precise duty it confers upon NetApp to disclose the materialization of the risk as a "nonrecognized subsequent event," and NetApp's failure to carry out its duties under GAAP. ¶¶54-57. *See also In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (allegation that defendants violated GAAP by failing to record a potential tax liability was evidence of scienter). When Defendants saw the purchasing deterioration from those customers whose buying practices were material to NetApp's financial success, they were required not only to reveal what they knew already, but to estimate its financial effect, or state that they could not do so. ¶55.

Defendants' use in other circumstances of the "Subsequent Events" Note of the financial statements requiring disclosure of known trends adds to the impact of the GAAP violation in establishing scienter. Defendants understood the purpose of the "Subsequent Events" Note, as in the 2019 10-K they used it to disclose an acquisition that occurred a week after their most recent required SEC filing. ¶¶44-45. That they knew the purpose of the Subsequent Events Note, and admit they had already seen a negative shift in enterprise customer sales by the second half of Q1 2020, ¶64, but nevertheless chose not to disclose this subsequent event in the "Subsequent Events" Note in the 2019 10-K, is evidence of a cold calculation, and supports a strong inference of scienter.

Suspicious insider stock sales further contribute to the strong inference of scienter. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1167 (D. Or. 2015). Defendant

- 21 -

Pasek made discretionary sales of 43% of his NetApp holdings during the Class Period, on June 3, 2019, just days after the May 22, 2019 issuance of the revenue forecast, garnering approximately $3.4 million from these sales. ¶69. Defendant Fawcett made discretionary sales of approximately 50% of his NetApp holdings on June 21, 2019, during the second half of the Class Period and just three days after the 2019 10-K was issued, garnering approximately $2.4 million. ¶70. Courts have ruled that insider sales of far smaller or equivalent percentages contribute to a strong inference of scienter. *See,* e.g., *In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (sale of 18% of shares during Class Period contributes to strong inference of scienter); *Fecht*, 70 F.3d at 1084 (executive's sale of 50% of his stock holdings constitutes "circumstantial evidence that the defendants knew or had reason to know that the financial condition of the Company was deteriorating well before they disclosed the problems ….").

Defendants argue that the absence of non-discretionary stock sales by the CEO argues against a finding of scienter. D. Br. at 21-22. Sales by the CFO and Senior Vice President and General Counsel, however, do support a strong inference of scienter, as noted above. Further, this Court should consider Executive Vice President for Product Operations Reich's sale of 77% of his holdings during the Class Period as supporting a strong inference of scienter. While Reich is not a defendant here because he did not himself utter any false statements or sign the 2019 10-K, Reich's job title establishes that he would have known that product sales were being cancelled or delayed. As such, his stock sales support a strong inference of scienter.

Defendants Kurian's and Pasek's signatures on SOX certifications attached to the 2019 10-K contributes to a strong inference of scienter. Plaintiffs have pled with specificity that Defendants Kurian and Pasek signed Sarbanes-Oxley certifications attached to the 2019 10-K, and spoke during the August 1 Call. ¶¶11-12. Corporate officers who sign SOX certifications containing misrepresentations are liable under Section 10(b) and the signatures contribute to a strong inference of scienter. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000). The Complaint here alleges with specificity that when Defendants signed the SOX

PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Certifications they already knew about the deterioration in the purchase rates, ¶64, but ignored their duty to disclose information that would have rendered the risk warning "not misleading." *See* ¶18. The signed SOX certifications support a finding of a strong inference of scienter. *See Wieland v. Stone Energy Corp.*, No. CIV.A. 05-2088, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2007) (scienter sufficiently pled in connection with SOX Certifications when evidence suggested defendants knew of inaccuracies in financial reports);

While Defendant Kurian's admission that NetApp saw the deceleration in enterprise customer purchases by the second half of Q1 2020, alone, raises a strong inference of scienter, a holistic analysis demonstrates that the strong inference of reckless, fraudulent behavior is at least as compelling as any opposing inference. Scienter for the June 18, 2019 10-K is adequately pleaded.

### 3. The Complaint Adequately Pleads Scienter as Defendants Knew that their May 22, 2019 Forecast was False when they Issued it

Defendants argue that the Complaint fails adequately to plead that they knew their projection was false when made. Since "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," and the two requirements may be combined into a unitary inquiry under the PSLRA," *In re Daou* 411 F.3d at 1015, the allegations sufficient to allege the knowing falsity, see *supra.*, also allege Defendants' scienter.[10] In addition to the facts and law establishing Defendants' knowledge that their forecast was false when issued, which, alone, support a finding of scienter, several other factors, including the insider stock sales, support a finding of scienter.

### E. The Complaint Adequately Alleges a Section 20(a) Violation

As Plaintiffs have adequately pled a primary violation of Section 10(b), Defendants' only challenge to control person liability under Section 20(a) is rebutted. *See Zucco Partners, LLC v.*

---

[10] Plaintiffs incorporate herein the discussion in Section IV.C.2, *supra.*, establishing the falsity of the May 22, 2019 projections. Further, they also incorporate herein Section IV.D.2, above, establishing Defendants' scienter for the false statement in the June 18, 2019 10-K.

- 23 -

*Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). As such, this Court should deny dismissal of Plaintiffs Section 20(a) claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. Should the Court grant Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend.

Dated: May 19, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg, *pro hac vice*
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

- 24 -

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2020, I electronically filed the foregoing *PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

THE ROSEN LAW FIRM, P.A.

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

- 25 -