KEITH E. EGGLETON, State Bar No. 159842
BENJAMIN M. CROSSON, State Bar No. 247560
CHERYL W. FOUNG, State Bar No. 108868
CHARLES A. TALPAS, State Bar No. 308505
CURTIS S. KOWALK, State Bar No. 324770
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: keggleton@wsgr.com
       bcrosson@wsgr.com
       cfoung@wsgr.com
       ctalpas@wsgr.com
       ckowalk@wsgr.com

Attorneys for Defendants
NetApp, Inc., George Kurian, Ronald J. Pasek,
and Matthew K. Fawcett

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CHAD C. SMITH, Individually and on Behalf of All Other Similarly Situated,<br><br>            Plaintiff,<br><br>      v.<br><br>NETAPP, INC., GEORGE KURIAN, RONALD J. PASEK and MATTHEW K. FAWCETT,<br><br>            Defendants. | CASE NO.: 4:19-cv-04801-JST<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Date: August 5, 2020<br>Time: 2:00 p.m.<br>Courtroom: 6<br>Hon. Jon S. Tigar |

## TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    PLAINTIFF FAILS TO PLEAD THAT DEFENDANTS MADE A
      MATERIALLY FALSE OR MISLEADING STATEMENT. ..........................................2

      A.    Plaintiff Ignores The Pre-Class Warnings About Adverse Economic
            Developments And Consequences In A Failed Effort To Plead The May 22,
            2019 Forecast Was False Or Misleading.............................................................2

            This Court May And Should Consider Pre-Class Period Warnings ....................2

            February 13, 2019 Disclosures................................................................3

            February 19, 2019 Disclosures................................................................5

            NetApp's February Disclosures Warned of the Precise Risks Plaintiff
                  Alleges Went Undisclosed ..........................................................5

      B.    The Opposition Fails To Cite Any Contradictory Facts Contemporaneous
            With The May 22 Forecast Or 2019 Form 10-K And Relies Solely On
            Hindsight. ..........................................................................................6

      C.    The Safe Harbor Immunizes The May 22 Forecast As A Matter Of Law. .............7

            The Opposition Fails To Show The Warnings And Disclosures Were Not
                  Meaningful ..............................................................................7

            The Opposition Effectively Concedes There Was No Knowledge Of Falsity
                  As Of May 22, 2019 ....................................................................9

      D.    The June 18, 2019 Form 10-K Was Not Materially False Or Misleading. ...........10

            The Form 10-K Provided Relevant And Timely Warnings About Ongoing
                  And Anticipated Risks ..............................................................10

            Plaintiff Misstates Defendants' Statements..........................................12

            The Analogy To *Flynn* Fails .................................................................13

            The Item 303 Allegations Fail..............................................................14

II.   PLAINTIFF FAILS TO RAISE A STRONG INFERENCE OF SCIENTER.................14

            NetApp's Relevant Warnings And Disclosures Undermine Scienter ...................14

            The Absence Of Conflicting Contemporaneous Facts Undermines Scienter .......15

Stock Issues Do Not Support Scienter ...................................................................15

CONCLUSION ...............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................................. 13

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ........................................................ *passim*

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ................................................................................... 9

*Flynn v. Sientra, Inc.*,
    No. CV 15-07548 SJO, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................. 13

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999) ..................................................................................... 3

*In re American Apparel, Inc. S'holder Deriv. Litig.*,
    No. CV 10-06576 MMM, 2012 WL 9506072 (C.D. Cal. July 31, 2012) ........................... 3

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ..................................................................................... 3

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ............................................................................. 8, 9

*In re Fusion-io, Inc. Sec. Litig.*,
    No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............................. 9

*In re Intel Corp. Sec. Litig.*,
    No. 18-cv-00507-YGR, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ................... 2, 3, 10

*In re Mellanox Techs. Ltd. Sec. Litig.*,
    No. 13-cv-04909-JST, 2014 WL 12650991(N.D. Cal. Mar. 31, 2014) ..................... *passim*

*In re Netflix, Inc., Sec. Litig.*,
    923 F. Supp. 2d 1214 (N.D. Cal. 2013) ................................................................... 14

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ................................................................................. 14

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ............................................................................. 14, 15

*In re SeeBeyond Techs Corp. Sec. Litig.*,
    266 F. Supp 2d 1150 (C.D. Cal. 2003) ..................................................................... 9

*In re Silver Wheaton Corp. Sec. Litig.*,
    No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ................... 14

*In re SolarCity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ............................................................................... 8

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)........................................................................................... 14

*In re Zumiez Inc. Sec. Litig.*,
   No. C07-1980-JCC, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ................................ 7

*Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ................................................................. 6, 7, 15

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ...................................................................... 8, 9

*McGovney v. Aerohive Networks, Inc.*,
   No. 18-CV-00435-LHK, 2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ............... 5, 6, 7, 14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
   America West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003)........................................................................................... 9

*Oregon Public Emps. Ret. Fund v. Apollo Group Inc.*,
   774 F.3d 598 (9th Cir. 2014)........................................................................................... 6

*Police Retirement Sys v. Intutive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)................................................................................... 7, 14

*Schueneman v. Arena Pharmaceuticals, Inc.*,
   840 F.3d 698 (9th Cir. 2016)........................................................................................... 6

*Seaman v. California Business Bank*,
   No. 13-cv-02031-JST, 2014 WL 1339649 (N.D. Cal. Apr. 2, 2014)................................ 14

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010)........................................................................................... 3

*Wozniak v. Align Technology, Inc.*,
   No. C-09-3671-MMC, 2011 WL 2269418 (N.D. Cal. June 8, 2011) ................................ 3

*Yanek v. Starr Surgical Co.*,
   388 F. Supp 2d 1110 (C.D. Cal. 2005)............................................................................. 9

**STATUTES, RULES AND REGULATIONS**

17 C.F.R. § 229.303(a)(3)(ii) ..................................................................................................... 13

## TABLE OF ABBREVIATIONS

| "Complaint" or "¶" | Amended Class Action Complaint for Violation of the Federal Securities Laws, filed January 24, 2020, ECF No. 41 |
| --- | --- |
| "Ex." | Exhibits attached to the Foung Decl. |
| "Foung Decl." | Declaration of Cheryl W. Foung in Support of Defendants' Motion to Dismiss Amended Class Action Complaint, filed March 26, 2020, ECF No. 43 |
| "MTD" | Defendants' Notice of Motion and Motion to Dismiss Amended Class Action Complaint, filed March 26, 2020, ECF No. 42 |
| "Opp." or "Opposition" | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed May 19, 2020, ECF No. 47 |
| "Reform Act" or "PSLRA" | Private Securities Litigation Reform Act of 1995 |

**INTRODUCTION**{ TC "INTRODUCTION" \f C \l "1" }

Plaintiff's Opposition to Defendants' Motion to Dismiss drips with irony.  Plaintiff sued the Defendants for allegedly committing securities fraud based on the purported failure to disclose that adverse global economic factors were causing NetApp's customers to reduce budget and purchases.  The MTD shows *NetApp publicly disclosed those very facts, over and over, before and during the Class Period.*  The Complaint itself cites to those disclosures and statements and the documents which contain them.  The Opposition does as well.[1]

Plaintiff now calls foul against Defendants, arguing that the Court should not consider those disclosures, describing those disclosures as "Defendants' Alternate Universe Of Facts at the Pleading Stage."  Opp. at 6.  This glib characterization is the real falsehood.  Consideration of those disclosures is central to this Court's legal determination of the issues at bar.  That legal determination includes whether Plaintiff adequately pleads that Defendants knowingly made false and misleading statements and omissions—they did not.  It also includes whether the disclosures are adequate under the Safe Harbor, thereby immunizing the May 22, 2019 forecast—they are.  The Court need not assume the truth of the disclosures' content; it need merely recognize, as countless courts have done in analogous situations, that such disclosures were made.  Given Defendants' forthright and timely disclosures, they did not deceive NetApp's investors as alleged.  The Complaint fails to state a claim or meet the requirements of the Reform Act.  Accordingly, the Complaint should be dismissed.

---

[1] *See* Opp. at 3 ("*Around the start of calendar year 2019*, NetApp told investors that macroeconomic issues, including U.S.-China trade disputes, 'materially impacted' its largest customers' spending and that the deceleration…would impact NetApp's FY2020 results") (citing ¶¶ 25-29); Opp. at 4 ("on May 22…Defendants acknowledged that, 26 days into the first quarter…customer spending behavior had not improved") (citing ¶ 35).  Emphasis is added unless noted otherwise.

**ARGUMENT**{ TC "ARGUMENT" \f C \l "1" }

I.  **PLAINTIFF FAILS TO PLEAD THAT DEFENDANTS MADE A MATERIALLY FALSE OR MISLEADING STATEMENT.**

A.  **Plaintiff Ignores The Pre-Class Warnings About Adverse Economic Developments And Consequences In A Failed Effort To Plead The May 22, 2019 Forecast Was False Or Misleading.**

**This Court May And Should Consider Pre-Class Period Warnings**{ TC "This Court May And Should Consider Pre-Class Period Warnings" \f C \l "3" }.  Unusual here is that negative disclosures marked the quarter preceding the Class Period and the Class Period itself.  NetApp made material disclosures on February 13, 2019, during an earnings conference call reporting Q319 financial results, and in its Q3 Form 10-Q filed on February 19, 2019.  Further, simultaneous with NetApp's guidance on May 22, 2019, was its report of disappointing results for the recently completed quarter.  Ex. 4 at 6; MTD at 3.  As a result, NetApp conservatively forecast first quarter revenues which "implied a 6% decline in revenues year-over-year."  MTD at 3, 10-14.  NetApp's disclosures described an ongoing negative macroeconomic environment producing uncertainty, and concern about its adverse effects on NetApp's customers and spending.  MTD at 1-3.  NetApp's warnings about adverse macroeconomic factors and resulting risks—months before that forecast and the start of the Class Period—encompass the very issues before this Court.

Recognizing that these warnings and disclosures undermine the Complaint, the Opposition seeks to shield them on the baseless premise they cannot be considered for the "truth."  Opp. at 6, 7, 8, 13.[2]  This Court should reject Plaintiff's effort to ignore these timely disclosures.  Defendants' disclosures about the weakening macroeconomic environment and tariff issues and their adverse impact on NetApp's customers *months before the Class Period even started* are directly relevant and need only be considered for the fact they were made.  Courts acknowledge that a defendant's disclosures are not submitted "for the truth of [their] content, but to 'indicate

---

[2] Defendants address Plaintiff's arguments concerning judicial notice in the Defendants' accompanying Reply re Request for Judicial Notice in Support of Motion to Dismiss Amended Class Action Complaint.

what was in the public realm at the time.'" *In re Intel Corp. Sec. Litig.*, No. 18-cv-00507-YGR, 2019 WL 1427660, at *6 & n.9 (N.D. Cal. Mar. 29, 2019) (citation omitted) (citing *inter alia Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("tak[ing] judicial notice that the market was aware of the information contained in news articles submitted by the defendants")).[3]

NetApp's disclosures before the Class Period started are relevant and appropriately considered. In *Wozniak v. Align Technology, Inc.*, No. C-09-3671-MMC, 2011 WL 2269418 (N.D. Cal. June 8, 2011), Judge Chesney reviewed disclosures in the months leading up to the start of the class period, which showed that information allegedly withheld was in fact disclosed to investors. *Id.* at *10; *id.* at *11 ("disclosures[] made both prior to the Class Period and reiterated during it[] revealed the very backlog, understaffing, and customer complaints plaintiff alleges were omitted."). There, as the Court should do here, Judge Chesney found "the [complaint] fails to state a cause of action for securities fraud based on a theory of omission." *Id.* at *11 ("where allegedly omitted information was part of the 'total mix of information' available, plaintiff could not state a claim under § 10(b)") (quoting *Heliotrope*, 189 F.3d at 976).[4] *See In re American Apparel, Inc. S'holder Deriv. Litig.*, No. CV 10-06576 MMM (RCx), 2012 WL 9506072, at *19 (C.D. Cal. July 31, 2012) ("Taking judicial notice of news reports and press releases [before and during the class period] is appropriate to show 'that the market was aware of the information contained in news articles'") (quoting *Heliotrope*, 189 F.3d at 981 n.18); *see* MTD at 10, 12 n.10.

**February 13, 2019 Disclosures**{ TC "February 13, 2019 Disclosures" \f C \l "3" }. The Complaint specifically acknowledges statements made on February 13, 2019, including that

---

[3] *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true'") (citation omitted).

[4] *Accord, In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) ("to prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression").

NetApp's customers reduced purchases because of "economic and political uncertainty" and "trade policy." *See* ¶ 11 (Kurian spoke about guidance on February 13, 2019); ¶ 12 (citing February 13 conference call); ¶ 25 (same; "Kurian stated that 'the largest customers are the ones that are most affected by both economic and political uncertainty around the globe'"); ¶ 27 (same; "'we saw slowdown in purchasing across the board in January, driven by deteriorating outlooks for the global economy, as well as uncertainty around trade policy'"; "with respect to 'the rate of deceleration' in spending by enterprise customers… 'things changed materially through the last week of December and really January'").

NetApp's February 13 earnings call for Q3-19 bluntly stated that the Company had encountered challenges in Q3 and that the "*macroeconomic environment is outside of [its] control*[.]" Ex. 1 at 3. As the Complaint (¶ 27) concedes, CEO George Kurian reported that NetApp witnessed a "slowdown in purchasing across the board in January, driven by deteriorating outlooks for the global economy, as well as uncertainty around trade policy." *Id.*; Ex. 1 at 3, 7. As a result, NetApp encountered "demand headwinds," "challenges," and "heightened" "[c]ustomer caution around the macro backdrop." Ex. 1 at 3, 5. NetApp's "largest customers became more cautious in their purchasing behavior" (*id.* at 3) as "[m]acrocroeconomic issues *were already affecting [their] spending patterns.*" ¶ 25. Mr. Kurian acknowledged that, [l]ike any company, we do not have perfect visibility into all the reasons for purchasing slowdowns." Ex. 1 at 3.[5] NetApp disclosed that "those industries with specific exposure to China and public sector were incrementally more cautious." *Id.* at 10. This slowdown resulted in revenues at the low end of guidance, which, according to analysts, was "the first time in …6 quarters[.]" *Id.* at 3-4, 6, 17. Rather than suggest this was just a temporary hiccup, *the Complaint itself acknowledges* Mr. Kurian said the opposite:

> [W]ith regard to some of our largest customers there will be time before they come back to their normal course of spending.

---

[5] The Opposition (at 3) contends that "boast[s]" of NetApp's "close relationships with and visibility into the spending of [its] biggest customers" provided the "ability to foresee significant changes in their largest customers' spending patterns." Whether or not that is so, Plaintiff disregards the many disclosures that NetApp made that its customers were impacted by the macroeconomic changes and reducing their orders accordingly.

¶ 30; Ex. 1 at 8.  *See* ¶ 39(d) (Q1 forecast false because "decreased spending by large enterprise customers *would not be reversed for an extended period of time*").

**February 19, 2019 Disclosures{** TC "February 19, 2019 Disclosures" \f C \l "3" **}.**  The Complaint likewise specifically cites NetApp's February 19, 2019 Q3 10-Q, alleging that Messrs. Kurian and Pasek signed its certifications and that those certifications were false.  ¶¶ 11, 18.  The Q3 10-Q warned of "current trade tensions between the U.S. and China, including newly imposed tariffs" and that NetApp's "revenue may decline…on a year-over-year basis" as a result of "changing economic and business environments."  Ex. 2 at 44, 48.  Customers were "*reducing IT budgets*" and "*diverting spending* towards transformational projects."  Ex. 2 at 44.  NetApp called out that while a "significant portion of [its] net revenues" comes from "sales to a limited number of distributors," "unfavorable economic conditions may negatively impact [their] solvency" or ability "to obtain credit to finance purchases of [NetApp's] products."  Ex. 2 at 47; *see* MTD at 13 n.11.  *See* ¶ 39(a) (NetApp relies on "a small number of very large enterprise customers").  The Complaint concedes that "[b]efore the Class Period, NetApp warned that changes in this small group's ordering patterns would materially impact its financial results."  ¶ 23.  Noteworthy is that NetApp warned in its Q3 10-Q:

> "[*c*]*ontinuing uncertain economic and political conditions restrict [its] visibility*" and "*limited [its] ability to forecast future demand for our products[.]*"

Ex. 2 at 46.[6]  NetApp expected these challenges to continue and warned that these "conditions have resulted, *and may in the future again result, in failure to meet [its] forecasted financial expectations and to achieve historical levels of revenue growth*."  *Id.*

**NetApp's February Disclosures Warned Of The Precise Risks Plaintiff Alleges Were Undisclosed{** TC "NetApp's February Disclosures Warned of the Precise Risks Plaintiff Alleges Went Undisclosed" \f C \l "3" **}.**  NetApp's disclosures on February 13 and 19 are on point and

---

[6] *See McGovney v. Aerohive Networks, Inc.* (*Aerohive II*), No. 18-CV-00435-LHK, 2019 WL 8137143, at *13-14 (N.D. Cal. Aug. 7, 2019) (dismissing missed forecast case; company described delays, problems, and warned that it "'*is difficult…to forecast our future operating results'* or engage in 'accurate financial planning'").

plainly relevant. The Complaint alleges that the May 22, 2019 forecast was "materially and knowingly false" because there were changes in customers' ordering patterns; customers reduced their spending and lengthened their decision cycles "over which NetApp had no control"; the "'rate of deceleration' in spending" "worsened materially …up to the start of the Class Period"; and that "decreased spending by large enterprise customers would not be reversed for an extended period of time." ¶¶ 39a-d. Yet NetApp disclosed these precise risks three months earlier, in February.[7]

Plaintiff cannot state a claim by ignoring the relevant disclosures made to NetApp's investors. *See Aerohive II*, 2019 WL 8137143, at *12 ("Aerohive disclosed what Plaintiffs allege Aerohive omitted, namely the problems with the E-Rate program") (citing *Oregon Public Emps. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) ("Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors") (citation omitted)); *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019) ("Crucially, Plaintiff ignores the disclosures that were made and that Plaintiff concedes in the Complaint.").

**B.      The Opposition Fails To Cite Any Contradictory Facts Contemporaneous With The May 22 Forecast Or 2019 Form 10-K And Relies Solely On Hindsight.**

Plaintiff must plead "specific facts"—"evidentiary facts" contemporaneous with a challenged statement to show why it was false when made. MTD at 7-9.[8] Plaintiff fails to do so for the May 22 forecast or the risk disclosures in the June 18, 2019 Form 10-K. Plaintiff cites no

_____

[7] The Opposition's reliance (at 8, 12) on *Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698 (9th Cir. 2016), a scienter case, only serves to underscore NetApp's transparency. NetApp's blunt, negative, and repeated disclosures are in stark contrast to Arena's false, "positive" statements that animal studies supported findings its drug was not carcinogenic when in fact "Arena knew that the rats receiving lorcaserin were getting cancer." 840 F.3d at 700-02, 706. *See id*. at 704 ("once they raised the animal studies, Defendants were obligated to disclose the Rat Study's existence").

[8] *Aerohive II*, 2019 WL 8137143, at *14 ("Plaintiffs do not quantify the severity" of product problems "which makes it difficult to assess the falsity of Defendants' statements"; that "free support services" allegedly cost Aerohive "hundreds of thousands" is "vague figure"); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 925, 929 (N.D. Cal. 2017) (Plaintiff provides no "content of the original or revised forecasts that quantifies or clarifies what Defendants knew and when, and how it proves Defendants' statements were false when made.")

confidential witness allegations, internal sales reports, or facts to bolster his allegations.[9] Plaintiff simply pronounces that NetApp should have declared the May 22 forecast false because it "would not achieve the Q1 2020 revenue and earnings per share guidance."  ¶ 39(e).

Nor does the Complaint allege that NetApp failed to take the negative economic factors into account when setting its guidance.  The Opposition is conspicuously silent on this issue.  It is not reasonable to infer a failure to take those factors into account where NetApp proactively acknowledged the adverse macroeconomic environment and impact on customer spending.  MTD at 8; *In re Zumiez Inc. Sec. Litig.*, No. C07-1980-JCC, 2009 WL 901934, at *11 (W.D. Wash. Mar. 30, 2009) ("nothing in the Complaint suggests that Defendants did not take such problems into account when generating the Company's projections"); *Aerohive II,* 2019 WL 8137143, at *12 (same).  NetApp's projection for Q1 2020 appeared reasonably conservative, where the "midpoint implie[d] *a 6% decline* in revenues year-over-year."  Ex. 4 at 6.[10]

**C.      The Safe Harbor Immunizes The May 22 Forecast As A Matter Of Law.**

**The Opposition Fails To Show The Warnings And Disclosures Were Not Meaningful{** TC "The Opposition Fails To Show The Warnings And Disclosures Were Not Meaningful" \f C \l "3" **}**.  NetApp followed the Safe Harbor to a tee for its Q1 2020 forecast. MTD at 14-16; Ex. 4 at 2-3.  Before providing guidance for its first quarter of 2020,  NetApp identified forward-looking statements, disclaimed any obligation to update projections, and provided relevant warnings and disclosures, including "global, political, macroeconomic and market conditions" that could harm results.  MTD at 14.  The Ninth Circuit held a similar prefatory statement's "cautionary language...sufficient"; "forward-looking statements are exempt under the PSLRA's safe harbor provision."  *Police Retirement Sys v. Intutive Surgical, Inc.*, 759

---

[9] *See Lu*, 417 F. Supp. 3d at 1278 ("Plaintiff must specifically allege how new, post-patent expiration competition caused these results.  Simply asserting that Defendants launched promotions 'because the Company's sales were on a downward trend'…is inadequate under Ninth Circuit law"; "that Defendants implemented discounts to... 'secure a competitive edge' [is] too generalized to link expansion of competition following the patent expirations with the third-quarter results") (citation omitted).

[10] *See Aerohive II*, 2019 WL 8137143, at *15 (reality was that Dell suffered major losses due to Aerohive's lack of adequate support; complaint failed to allege that "Aerohive executives did not consider this information when they created the 4Q17 guidance").

F.3d 1051, 1060 (9th Cir. 2014).

The Safe Harbor preface directed investors to NetApp's SEC filings.  Ex. 4 at 3; *see* Ex. 2 at 44-54; Ex. 9 at at 15-25.  NetApp's Q3 10-Q filed on February 19, 2019 is covered by the Safe Harbor introduction of the May 22 forecast.  NetApp's Q3 10-Q specifically warned of ongoing "trade tensions between the U.S. and China"; the imposition of tariffs; that customers were "reducing IT budgets" and "diverting spending towards transformational projects"; that its customers' "solvency" might be "negatively impact[ed];" that NetApp's business would be "challenge[d]... for the foreseeable future"; and that its "visibility" was "restrict[ed]."  Ex. 2 at 44, 46, 47; ¶ 23.  Plaintiff asserts that "none of Defendants' cautionary statements is meaningful" under the Safe Harbor.  Opp. at 15.  Plaintiff simply ignores Ninth Circuit precedent.  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (statement that "factors like Cutera's 'ability to continue increasing sales performance worldwide' could cause variance in results" held sufficiently cautionary language under Safe Harbor) (citation omitted).

The Opposition concedes that "Defendants had warned earlier about risks from changes in their largest customers' spending" in the Q3 10-Q.  Opp. at 8.  Yet, Plaintiff asserts that "the Court [may] not take the statements Defendants specifically cite to from that document for their truth"; "Defendants deploy filed documents in ways that do not parry or place in context any statements cited in the Complaint." *Id.*  This argument fails. *Intuitive Surgical* and *Cutera* make plain that pursuant to the Safe Harbor, courts consider the content of the disclosures and warnings.

Plaintiff cannot contend that NetApp's warnings were not relevant or meaningful where the adverse effects of the economy were harming customers and are at the heart of the allegations in this action.[11] *See In re Mellanox Techs. Ltd. Sec. Litig.*, No. 13-cv-04909-JST, 2014 WL 12650991, at *11-12 (N.D. Cal. Mar. 31, 2014) ("Mellanox either directly included sufficient cautionary language, or directed listeners to review the risks discussed in greater detail in other documents" *including the fact of limited visibility and reliance on a small number of customers*);

---

[11] Even though NetApp's risk disclosures were directly on point, this Court has recognized that Safe Harbor protection would apply even if that were not the case. *Bodri*, 252 F. Supp. 3d at 930-31.

*In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 993 (N.D. Cal. 2017) ("warning language specifically refers to a potential lack of demand and...that...contracts would be cancelled, the two risk factors that Plaintiffs allege that Defendants failed to disclose").[12]  NetApp's relevant cautions "immunize[] the company's forward-looking statements." *Mellanox,* 2014 WL 12650991, at *11.

Plaintiff has failed to demonstrate that NetApp's risk disclosures accompanying the May 22 forecast were not meaningful.  Where, as here, the warnings are meaningful, the Safe Harbor makes the "state of mind of the individual making the statement. . . irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *Mellanox*, 2014 WL 12650991, at *13 (quoting *Cutera*, 610 F.3d at 1112).  Specifically:

> [w]hen statements are identified as forward-looking and are accompanied by meaningful cautionary langauge, they automatically fall within the PSLRA's safe harbor and no showing of the speaker's state of mind can revive claims based on the immunized statements.

*Id.* at *13; *see Bodri*, 252 F. Supp. 3d at 929.  The Opposition *inexplicably disputes this settled law*.[13]

**The Opposition Effectively Concedes There Was No Knowledge Of Falsity As Of May 22, 2019{** TC "The Opposition Effectively Concedes There Was No Knowledge Of Falsity As Of May 22, 2019" \f C \l "3" **}.**  In a failed effort to show Defendants knew the May 22 forecast was false when made, the Opposition asserts that Defendants "admitted that they knew

---

[12] *See Bodri*, 252 F. Supp. 3d at 931 (warnings about risks with new product introductions were sufficient); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1061 (N.D. Cal. 2019) (Form 10-Q had warned that timing of sales was "'highly variable'"); *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *10, *13 (N.D. Cal. Feb. 12, 2015) ("that Fusion was facing increasing competition...was discussed in...risk disclosures").

[13] The Opposition (at 17) relies on *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003).  That Court's discussion of the Safe Harbor is dicta and not binding.  *See Cutera*, 610 F.3d at 1113.  Plaintiff's authority recognizes this fact. *In re SeeBeyond Techs Corp. Sec. Litig.*, 266 F. Supp 2d 1150, 1164-65 (C.D. Cal. 2003).  Similarly, the Opposition's reliance (Opp. at 15-16) on *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995), has no application here as that decision on November 20, 1995, was decided before the Reform Act was even enacted on December 22, 1995.

enterprise customer sales were being materially affected by *June 10, 2019*."[14]  Opp. at 16. Plaintiff cannot explain how any purported knowledge of falsity on *June 10*—to the extent any existed—makes guidance given on *May 22* (*19 days earlier*) false when made.[15]  Opp. at 16.  *See Bodri*, 252 F. Supp. 3d at 932 ("Plaintiff fails to allege facts showing Defendants knew at Session's launch on July 12, 2015, that it could not meet its Q3 2015 guidance announced nine days later").[16]  In any event, Defendants merely stated that sales were affected, not that NetApp would miss its forecast by a date certain.  MTD at 4-5; *infra* at 12-13.  In sum, the Safe Harbor applies to the May 22 forecast and renders it not actionable as a matter of law.

### D.    The June 18, 2019 Form 10-K Was Not Materially False Or Misleading.

**The Form 10-K Provided Relevant And Timely Warnings About Ongoing And Anticipated Risks{** TC "The Form 10-K Provided Relevant And Timely Warnings About Ongoing And Anticipated Risks" \f C \l "3" **}**.  In addition to making meaningful disclosures on February 13 and 19, 2019, before the start of the Class Period, NetApp did so in its June 18, 2019 FY19 Form 10-K.  MTD at 16-17.  The Form 10-K did not simply warn about possible future challenges: it made on-point warnings and disclosures about *current ongoing* concerns and challenges.  The Form 10-K expressly warned that "customers ***are****... reducing IT budgets.*"  Ex. 5 at 14.  NetApp's

> traditional market, the networked storage hardware market, experienced a decline in each of the last three calendar years due to a combination of customers delaying purchases in the face of technology transitions…and *changing economic and business environments*[;]…*customers are…reducing IT budgets*….As a result of these and other factors…our revenue may decline on a year-over-year basis, as it did in fiscal years 2015, 2016 and 2017.  *Id.*[17]

[14] That date is not in the Complaint (¶ 64), nor did Defendants state there was a material miss as of June 10.  Plaintiff counts June 10 as the halfway point in the quarter.

[15] *Cf. Yanek v. Starr Surgical Co.*, 388 F. Supp 2d 1110, 1118-19, 1123 (C.D. Cal. 2005) (no safe harbor protection where warnings of need to obtain regulatory approval failed to disclose receipt of FDA Warning Letters and Form 483 noting "significant objectionable conditions").

[16] *See Mellanox*, 2014 WL 12650991, at *11 (no falsity based on missed projection; "Given the availability of…business opportunities…Plaintiffs have not adequately alleged that Mellanox's executives had no reasonable basis to believe that the impressive revenue earnings would continue").

[17] *See Intel*, 2019 WL 1427660, at *11 n.15 (rejecting that risk warnings were false and misleading on the basis the risk had already materialized; disclosures "conveyed that Intel's products '*are* a frequent target' of hackers and that 'from time to time' intrusions occur".)

DEFS.' REPLY IN SUPPORT OF MOT. TO DISMISS               10
AMENDED CLASS ACTION COMP.
CASE NO.: 4:19-CV-04801-JST

The Form 10-K expressly warned that NetApp anticipated the ongoing economic and political conditions would "*challenge*" its "business *for the foreseeable future*":

> *Continuing uncertain economic and political conditions restrict our visibility and may harm our operating results, including our revenue and growth and profitability.* Continuing global economic uncertainty, political conditions and fiscal challenges in the …U.S. …and abroad have…*limited our ability to forecast* future demand for our products…and could *constrain future access to capital for our suppliers, customers and partners.* The impacts of these circumstances are global and pervasive, and the timing and nature of any ultimate resolution of these matters remain highly uncertain….*[W]e expect these concerns to challenge our business for the foreseeable future, which could cause harm to our operating results.*

Ex. 5 at 15. The Form 10-K specifically disclosed that "[s]uch conditions have resulted, and may in the future again result, in failure to meet our forecasted financial expectations and to achieve historical levels of revenue growth." *Id.*[18]

NetApp's Form 10-K further warned about an *additional* current business disruption—stemming from the *reorganization of its sales force*, which later proved to be another cause of the Company's missed guidance for Q1 2020:

> [W]e recently reorganized our sales resources to improve the alignment of those resources with customer and market opportunities…[which] could result in short or long-term disruption of our sales cycles and harm our operating results.

Ex. 5 at 15.  In addition, the Form 10-K reminded investors that first quarter results historically are lower; that orders are cancellable before shipment; and that NetApp does not "enter into binding purchase commitments with [its] customers, resellers and distributors for extended periods of time[.]" ¶ 40; Ex. 5 at 16.  The Form 10-K additionally stated that NetApp has:

> historically experienced a sequential decline in revenues in the first quarter [and] … [b]ookings and revenues typically follow intra-quarter seasonality patterns weighted toward the back end of the quarter.

Ex. 5 at 9, 16.  The Form 10-K warned that its customers' "standard purchase orders…are

---

[18] Plaintiff argues that even if NetApp achieved its forecast for 1Q20, its "false risk warning would remain actionably false[.]"  Opp. at 12.  *See id.* at 13 ("even if Defendants thought on June 18…the Company would somehow achieve its forecast, that does not excuse its failure to issue an accurate risk warning including the fact that they knew that the risk had already materialized.")  This ignores that the Form 10-K expressly warned about customers' ongoing reductions of IT budgets and anticipated challenges to its performance.

cancelable prior to shipment without penalty." Ex. 5 at 10.[19]  The Form 10-K did not fail to disclose that customers were "reducing and delaying purchases"; rather, it made clear that this "risk" was now a reality and occurring.  Given the Form 10-K's relevant and timely warnings, that SEC filing was neither false nor misleading.

**Plaintiff Misstates Defendants' Statements{** TC "Plaintiff Misstates Defendants' Statements" \f C \l "3" **}**.  The Opposition argues that Defendants improperly "conflat[e] forecast and risk warning[s]" and that the risk warnings made would still be false even had the Q1 2020 forecast been realized.  Opp. at 12.  This argument is nonsensical.  The Opposition cites to Defendants' "own words" that "a warned-about risk had specifically materialized." *Id*.  For support, the Opposition cites to ¶ 64, but ¶ 64 specifically addresses Mr. Kurian's statement about missing the forecast: "'we were largely on track to meet our guidance until the second half of the quarter.'"  In other words, *having argued that the meeting of guidance is not at issue*, Plaintiff cites to and *relies on the discussion addressing why the Company did not know earlier it would miss its guidance* made on May 22, 2019.

Further, Plaintiff substantially misstates Defendant Kurian's "words" and import.  On August 1, 2019, Mr. Kurian explained, looking back with the benefit of hindsight, "why we didn't see this coming when we provided our prior Q1 guidance[.]"  Ex. 6 at 3.  As Mr. Kurian made clear, there were a number of moving and complex parts, none of which Plaintiff addresses or considers.  NetApp "saw a softening of the IT hardware spending environment in the back half of the quarter." *Id.*  Yet, the "slowdown was not across the board." *Id.* [20]  There had been "adequate pipeline"; NetApp's "close rate" "through the first part of the quarter was actually on track;" and

---

[19] The Opposition asserts that risks had "materialized," yet the Complaint concedes they were earlier disclosed.  *Compare* Opp. at 9 ("the risk of enterprise customers reducing and delaying purchases had materialized"), *with* ¶ 27 (statement on February 13, 2019 that "'we saw slowdown in purchasing across the board in January, driven by deteriorating outlooks for the global economy, as well as uncertainty around trade policy'").

[20] It is undisputed that NetApp typically receives "a disproportionate percentage of each quarter's total bookings and related revenue occur *in the last month of the quarter*."  Ex. 5 at 16; *see also* Ex. 9 at 17.  Bookings are "*weighted toward the back end of the quarter*."  Ex. 5 at 17; Ex. 2 at 47.  Thus, Plaintiff's allegations of early knowledge of missed guidance is not plausible. *See Bodri,* 252 F. Supp. 3d at 928 (later admission that Defendant "had identified weak sell-throughs in late July…does not obviously conflict with Lazar's mid-to-late July statement").

NetApp's "APAC, Europe and U.S. public sector geographies were *mostly on track*." *Id.* at 3, 5. NetApp "did not see a decline in win rates"; its "product gross margins remained strong"; "cloud data services and public cloud spending projects…continue[d] apace"; and there was "continued growth in private cloud." *Id.* at 4-5.  Without defining a specific date—including the June 18, 2019 filing date of the Form 10-K—Mr. Kurian stated:

> [NetApp was] largely on track to meet our guidance until the second half of the quarter.  We then saw a deterioration in our close rates against the pipeline with deals getting both pushed out or downsized, especially in our largest global customers and the Americas. *Id.* at 4.

Further, NetApp was experiencing mixed performance with its sales teams, with some doing "really well in…growing our overall business" but some "need[ing] to improve our execution to gain share[.]" *Id*. at 4, 8.  Given the complexity of the quarter's events—including both optimistic and negative events with customers, geographies, and the sales force—Defendants "own words" do not establish when in the quarter it could have been known that the forecast would be missed, much less that was the case when the Form 10-K was being drafted or filed on June 18.

**The Analogy To *Flynn* Fails{** TC "The Analogy To *Flynn* Fails" \f C \l "3" **}.**  The Opposition likens this case to *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016).  The company in *Flynn* warned that its sole manufacturing partner might fail to follow proper manufacturing practices or might have significant compliance issues.  This warning was made at the very time that the company's internal investigation had confirmed particle contamination of breast implants, its sole product.  Brazil's *regulators had shut down all of the company's manufacturing, and the company had suspended all sales*, yet the company nonetheless proceeded with, and accelerated, its secondary public offering.  2016 WL 3360676, at *1-3, *10.  The undisclosed effective shut down of the business in *Flynn* bears no similarity to the case at bar.  NetApp repeatedly and consistently disclosed and warned about the adverse economic impacts on its customers, both before and during the Class Period.  Despite a setback, NetApp has continued to remain strong, with $3.5 billion in cash, cash equivalents and

investments reported as of August 14, 2019.  MTD at 5.  *Flynn* is not remotely on point.[21]

**The Item 303 Allegations Fail{** TC "The Item 303 Allegations Fail" \f C \l "3" **}.** NetApp's blunt warnings on February 13 and 19 and in the Form 10-K defeat Plaintiff's invocation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii).  As Judge Conti held:

> Plaintiffs' pleadings do not actually show that Defendants withheld information about a known trend or uncertainty in the *streaming* market, since Defendants repeatedly stated that success in the streaming market depended on multiple factors, especially Netflix's ability to keep its subscriber base large and happy.

*In re Netflix, Inc., Sec. Litig.*, 923 F. Supp. 2d 1214, 1221 (N.D. Cal. 2013).  There was no Item 303 or GAAP violation.[22]

Further, the Opposition ignores binding, on-point precedent.  Even if NetApp failed to make adequate disclosure, such purported failure is not a basis for a Section 10(b) claim.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 & n.9, 1056 (9th Cir. 2014) ("we hold that Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5"; "Item 303's disclosures duty is [not] actionable under Section 10(b) and Rule 10b-5") (citing *Intuitive Surgical*, 759 F.3d at 1061 n.4); *see* MTD at 18.

## II.    PLAINTIFF FAILS TO RAISE A STRONG INFERENCE OF SCIENTER.

Scienter requires deliberate recklessness or conscious misconduct—"intentional conduct." *Mellanox*, 2014 WL 12650991, at *7.  Plaintiff does not meet this standard.

**NetApp's Relevant Warnings And Disclosures Undermine Scienter{** TC "NetApp's

---

[21] The Opposition's reliance (at 10-11) on *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), is also misplaced.  The company there was dependent on two government agencies for 80% of its business and received four large stop-work orders.  There was an "immediate[] ce[ssation]" of earning money on the company's largest contract—resulting in the reassignment of 50-75 employees which made one facility a "ghost town."  527 F.3d at 984, 988 n.5.  The company counted the stopped work as part of its backlog, and misleadingly "touted the company's backlog" despite receipt of the stop-work orders on the company's largest contract.

[22] The Opposition's reliance (at 21) on *In re Silver Wheaton Corp. Securities Litigation*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *2-6 (C.D. Cal. June 6, 2016), could not be more different than this missed forecast case.  It involved whether the Canadian company under audit would be assessed taxes under Canada's transfer pricing rules for the income from its subsidiary located in the no-tax jurisdiction of the Cayman Islands, and whether the failure to record or disclose an actual or contingent tax liability rendered the balance sheets misleading and violated GAAP.  2016 WL 3226004, at *2-6.

Relevant Warnings And Disclosures Undermine Scienter" \f C \l "3" }.  Where, as here, Defendants make "repeated disclosure of negative information on the very topics they supposedly concealed," those disclosures "undermine[] an inference of a deliberate omission" and scienter. *Aerohive II*, 2019 WL 8137143, at \*23 (citing, *inter alia*, *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012)); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994); *Seaman v. California Business Bank*, No. 13-cv-02031-JST, 2014 WL 1339649, at \*7 (N.D. Cal. Apr. 2, 2014); MTD at 18-19.  Plaintiff's "response" is to adamantly insist that the Court ignore these disclosures.

**The Absence Of Conflicting Contemporaneous Facts Undermines Scienter**{ TC "The Absence Of Conflicting Contemporaneous Facts Undermines Scienter" \f C \l "3" }.  Plaintiff's reliance on hindsight, rather than pleading any contemporaneous facts, such as sales data contradicting the forecast, undermines scienter, as this Court has recognized.  *See Bodri*, 252 F. Supp. 3d at  932-33; MTD at 20.  NetApp's purported "access to and visibility into" customers' purchasing practices is not supportive of scienter, as this Court has recognized.  *Mellanox*, 2014 WL 12650991, at \*18 (such information "merely provide[s] that the company 'should have known' or 'could have known' about the [inventory] buildup."); MTD at 20.

**Stock Issues Do Not Support Scienter**{ TC "Stock Issues Do Not Support Scienter" \f C \l "3" }.  Plaintiff ignores that NetApp repurchased 3.9 million shares during Q1 2020, which this Court has found undermines scienter.  *Bodri*, 252 F. Supp. 3d at 933; MTD at 21.  In a similar vein, Mr. Kurian, the Company's *CEO, made no stock sales and held more shares at the end of the Class Period* (MTD at 21-22) to which Plaintiff has no good response.  Opp. at 22.  Such facts are "inconsistent with Plaintiff's theory" and undermine scienter.  *Rigel*, 697 F.3d at 884-85; MTD at 21-22.

Plaintiff does not dispute that Mr. Fawcett's June 3 sales were pursuant to a 10b5-1 plan, and the June 21 sale was six weeks before the stock price fell following the August 1 pre-announcement, making the timing not suspicious.  MTD at 22-23; *Lu*, 417 F. Supp. 3d at 1281.  NetApp has a significant percentage of deals that close in the final days of the quarter, making

such advance knowledge of a miss improbable.  MTD at 4 n.3.  Recognizing the weakness of his stock sale arguments, Plaintiff urges this Court to recognize sales *by non-defendant Mr. Reich* (Opp. at 22).  This Court should decline, as other courts in this District have done.  MTD at 22 & n.23.

Paraphrasing this Court, when considered holistically, the allegations do not overcome the competing inferences that Defendants simply underestimated the global economic forces at play, which were out of their control.  *See Bodri*, 252 F. Supp. 3d at 933.

## CONCLUSION{ TC "CONCLUSION" \f C \l "1" }

For the reasons stated, the Complaint should be dismissed.

Respectfully submitted,

DATED: July 9, 2020

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
By: /s/ Benjamin M. Crosson
Benjamin M. Crosson
*Attorneys for Defendants*