UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHAD C. SMITH,

Plaintiff,

v.

NETAPP, INC., et al.,

Defendant.

Case No. 19-cv-04801-JST

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Re: ECF No. 42

Lead Plaintiff Winston Derouin ("Plaintiff") brings this putative securities class action alleging violations of the federal securities laws by defendants NetApp, Inc. ("NetApp" or the "Company"); its President and Chief Executive Officer ("CEO"), George Kurian; its Executive Vice President and Chief Financial Officer ("CFO"), Ronald J. Pasek; and Senior Vice President, General Counsel, and Corporate Secretary, Matthew K. Fawcett (collectively, "Defendants"). Plaintiff alleges in the Amended Class Action Complaint ("Complaint") that Defendants made material misrepresentations by disclosing risks from macroeconomic factors affecting enterprise customers, without disclosing that those risks already materialized and would cause the Company to miss its earnings guidance. Defendants move to dismiss the Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF No. 42. Because Plaintiff fails to plead materially false or misleading statements and scienter, the Court will grant the motion.

I.    **BACKGROUND**

   A.    **Allegations in the Complaint**

   NetApp is a provider of cloud data services. ECF No. 41 ¶ 21. Most of NetApp's sales go to "enterprise" customers – distributors, original equipment manufacturers ("OEMs"), and other

"channel partners," who then sell to other customers. *Id*. ¶¶ 22-23. For example, in 2018, two distributors accounted for 44% of NetApp's sales. *Id*. ¶ 22. The reliance on a small number of very large customers makes NetApp vulnerable to shifts in those customers' orders, a fact that NetApp discloses to investors. *Id*. ¶ 23.

In recent years, macroeconomic issues begun affecting NetApp's business. *Id*. ¶ 25. In February 2019, prior to the class period, NetApp missed its earnings guidance for the previous quarter because "macro headwinds," such as the U.S.-China trade dispute, affected enterprise customer spending. *Id*. ¶¶ 25, 27. As NetApp's CEO explained, "the largest customers are the ones that are most affected by . . . both economic and political uncertainty," and they reduced and decelerated their spending in response to the uncertainty. *Id*. ¶¶ 25, 28. The CEO, Kurian, warned that "there will be time before they come back to their normal course of spending." *Id*. ¶ 30.

Two months later, on May 22, 2019, NetApp announced its earnings guidance for Q1 2020 and the fiscal year 2020. *Id*. ¶ 32. During an earnings call that the same day, Kurian "lamented" the poor performance in Q4 2019, noting, again, the slowed spending by enterprise customers. *Id*. ¶ 28. However, the Company announced a "quite good" outlook for fiscal year 2020, projecting 1% growth. *Id*. ¶¶ 35-36. On the same call, Kurian boasted of "very, very close" relationships with enterprise customers, which gave NetApp "visibility on any turn faster than most people." (*Id.* ¶ 24.) The forecasts for Q1 2020 and fiscal year 2020 were incorporated into NetApp's Form 8-K, which was certified by NetApp's General Counsel, Fawcett. *Id*. ¶ 32.

Then, on June 18, 2019, almost two months into the quarter, NetApp filed its 2019 Form 10-K, which discussed NetApp's financial condition and included multiple risk disclosures. *Id*. ¶¶ 40, 42. In relevant part, NetApp warned that "[a] portion of our revenues is generated by large, recurring purchases from various customers, resellers and distributors," and "loss, cancellation or delay in purchases" by these customers "has negatively affected our revenues in the past, and could negatively affect our revenues in the future." *Id*. ¶ 40. The risk disclosures specifically noted that "[a] significant portion of our net revenues are generated through sales to a limited number of customers and distributors," who "can stop purchasing and marketing our products at any time," particularly in response to "unfavorable economic conditions." *Id.* Kurian and the

United States District Court
Northern District of California

2

CFO, Pasek, certified the 2019 Form 10-K filing. *Id*. ¶ 18.

On August 1, 2019, NetApp preannounced that it underperformed its Q1 2020 guidance. *Id*. ¶ 2. The extent of the miss was significant: NetApp earned $243 million less than expected, which resulted in 50% lower earnings per share. *Id*. ¶¶ 60-61. NetApp also revised its fiscal year 2020 guidance from 1% growth to 5%-10% decline, warning investors not to rely on the old guidance. *Id*. ¶ 62. On a call later that day, Kurian, NetApp's CEO, attributed most of the miss to "macro concerns at our largest customers," who were "greatly reducing their purchases and instituting longer decision cycles." *Id*. ¶ 63. Kurian also attributed the miss to "a meaningful deceleration in overall IT hardware spending due to growing macro uncertainties." *Id*. As Kurian explained, "[w]e were largely on track to meet our guidance until the second half of the quarter," but "then saw a deterioration in our close rates against the pipeline with deals getting both pushed out or downsized." *Id*. ¶ 64. NetApp's share price declined by over 20%. *Id*. ¶ 66.

Plaintiff claims that the May 22, 2019 forecasts and June 18, 2019 Form 10-K contained material misstatements or omissions. With respect to the May forecasts, Plaintiff alleges that Defendants knew that their "financial success was dependent on a small number of very large enterprise customers," who "had greatly reduced their spending" beginning in 2018, which would "not be reversed for an extended period of time," and that NetApp thus knew that it "would not achieve the Q1 2020 revenue and earnings." *Id*. ¶ 39. With respect to the June risk disclosures, Plaintiff alleges that "Defendants admitted that by the second half of Q1 2020 they knew that the Company would fall materially short of its revenue and earnings," "knew and disregarded" that risks had already materialized, and knew all of the facts described for the May forecasts. *Id*. ¶ 31.

## II.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   REQUEST FOR JUDICIAL NOTICE

As a threshold matter, Defendants request judicial notice of several documents. In ruling on a 12(b)(6) motion to dismiss, the Court "must consider ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Documents may be incorporated by

United States District Court
Northern District of California

reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).  The court treats documents that are incorporated by reference "as though they are part of the complaint itself," assuming the truth of their contents.  *Id*. at 1002-03.  However, defendants may not use incorporation by reference "to insert their own version of events into the complaint" or "dispute facts stated in a well-pleaded complaint."  *Id*.  The purpose of the doctrine is to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims," not to resolve factual disputes.  *Id.*

In addition, a Court may take judicial notice of matters in the public record.  Federal Rule of Evidence 201(b) permits courts to consider "adjudicative fact[s]" that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Not every fact in a judicially noticeable document is "noticeable for its truth."  *Khoja*, 899 F.3d at 999.  As with incorporation by reference, "a court cannot take judicial notice of disputed facts" or use the doctrine to resolve factual disputes.  *Id*.  Thus, when a document "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes," judicial notice is improper.  *Id*. at 1000 (quoting *Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011)).

Here, Defendants seek to incorporate by reference several documents that Plaintiff claims to contain false or misleading statements, including the transcript of the May 22, 2019 call; the Form 8-K filed on May 22, 2019; and the June 18, 2019 Form 10-K.  ECF Nos. 43-3, 43-4, 43-5. These documents form the basis of Plaintiff's claims because they contain the allegedly actionable statements and are thus properly incorporated by reference.  Furthermore, Defendants seek judicial notice of documents that demonstrate the alleged disclosure to the market, including the transcripts of the August 1 and August 14, 2019 earnings calls.  ECF Nos. 43-6, 43-7.  These are properly incorporated by reference because Plaintiff uses them to demonstrate falsity.  Last, Defendants seek to incorporate the February 13, 2019 call transcript on which Plaintiff relies to establish that

Defendants knew of macroeconomic effects on their business. ECF Nos. 43-1. The transcript is cited extensively in the Complaint and properly incorporated by reference. However, Defendants also seek to incorporate by reference two SEC filings that are cited only once in the Complaint for the simple proposition that the defendants signed them. ECF Nos. 43-2, 43-8. These documents are neither extensively cited, nor central to Plaintiff's claims, and thus not properly incorporated by reference. *See Khoja*, 899 F.3d at 1002 ("[M]ere mention of the existence of a document is insufficient to incorporate the contents of a document.").[1]

Plaintiff objects to the above incorporation by reference requests on the grounds that Defendants seek to insert their own version of events. Paradoxically, most of the facts Defendants seek to support are already contained in the complaint. For example, Plaintiff objects to Defendants' citation to the February 19, 2019, Form 10-Q for the proposition that Defendants adequately warned investors of risks related to enterprise customers' spending patterns. ECF No. 47 at 8:14-17. However, that is exactly what the Complaint alleges, stating that in February 2019, Defendants told investors that they missed guidance due to reduced spending by enterprise clients facing macroeconomic uncertainty and that this pattern will likely continue. ECF No. 41 ¶¶ 23. 27, 30. While Defendants seek to provide additional context and detail, the general version of events is simply not disputed.[2] Nevertheless, the Court agrees that Defendants at times seek to introduce facts, such as the stock rebound and the positive news in the August 2019 disclosure, which are not relevant to Plaintiff's allegations. ECF No. 47 at 8:23-9:2. The only purpose of these facts is to create an alternative narrative, and the Court disregards them.

Turning to judicial notice, Defendants seek judicial notice of SEC filings that show the individual Defendants' stock trading history, NetApp's historical share price, and NetApp's risk

---

[1] The Court also errs on the side of caution, bearing in mind the Ninth Circuit's recent admonition that "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine, however, can lead to unintended and harmful results," and that these procedures should not be "exploit[ed] . . . improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 998.

[2] Defendants also argue that the documents are properly considered as risk disclosures for forward looking statements. However, risk disclosures are only relevant for statements that "accompany[] the forward-looking statement." 15 U.S.C. § 78u–5(e). Risk disclosures made months before the forward-looking statements, for entirely different predictions, are not relevant to the safe harbor.

United States District Court
Northern District of California

disclosures prior in April 2018. ECF Nos. 43-9 – 43-14. SEC filings are subject to judicial notice as sources whose accuracy cannot reasonably be questioned. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1349 (C. D. Cal. 2014). In this instance, Plaintiff argues that Defendants' stock trading demonstrates scienter and does not dispute the accuracy of the trades demonstrated in Defendants' documents. Accordingly, the Court takes judicial notice of those stock trades and share price history. Last, Defendants seek judicial notice of NetApp's 2018 Form 10-K to show that NetApp warned of the risks that Plaintiffs allege went undisclosed. Plaintiff disputes the adequacy of the risk disclosures, but not their authenticity or the fact that they were made. Because NetApp expressly referred to these risk disclosures during the May 22, 2019 investor call, the statements are properly considered as context for the PSLRA safe harbor for forward looking statements. *Cf. Police Retirement Sys v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (considering risk disclosures to evaluated accompanying forward-looking statements). Accordingly, the Court treats exhibits 1 and 3 through 7 as incorporated by reference and takes judicial notice of the risk disclosures in the 2018 Form 10-K and stock trades and share price history in exhibits 10 through 14, but declines to consider exhibits 2 and 8.

## IV.   LEGAL STANDARD

### A.   The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and "a party must state with particularity the circumstances constituting fraud or mistake."  15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.  "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

### B.      Falsity and Materiality

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  For statements to be actionable under the PSLRA, they must be both false or misleading and material.  A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted).

A false or misleading statement or omission is material if there is a "substantial likelihood

United States District Court
Northern District of California

United States District Court
Northern District of California

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (internal quotation marks and citations omitted).

### C.    Scienter

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976). In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must undertake a two-step inquiry by first considering "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "if no individual allegation is sufficient, . . . conduct[ing] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).

In the Ninth Circuit, scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is an extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration in original) (emphasis omitted) (quoting *City of Dearborn Heights*, 856 F.3d at 619). Stated differently, deliberate recklessness requires that an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Intuitive Surgical*, 759 F.3d at 1063 (citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

## V.   DISCUSSION

Defendants move to dismiss the Complaint on the grounds that Plaintiff fails to plead specific facts that show (1) the challenged statements were false or misleading or (2) Defendants acted with the requisite state of mind, sufficient to raise a strong inference of scienter.

### A.   False or Misleading Statements

#### 1.   May 22, 2019 Forecasts

Plaintiff claims that the earnings and growth forecasts made on May 22, 2019 were false or misleading because Defendants knew that NetApp's success depended on a small number of large enterprise customers, ECF No. 41 ¶ 39, knew that those customers reduced their spending in late 2018, *id.*, knew that the spending worsened further in early 2019, *id.*, and knew that it would not be reversed soon, *id.*, such that Defendants must have known they would not reach their guidance.

At the outset, the Court cautions against "fraud by hindsight." *See Silicon Graphics.*, 183 F.3d at 988. Merely because defendants made optimistic statements and later admitted a more

9

pessimistic reality does not show that the difference is attributable to fraud. *Id*. That is because "[s]ecurities fraud cases often involve some more or else catastrophic event occurring between the time the complaint-of statement was made and the time the sobering truth is revealed," such as a change in the market or shift in consumer demand. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001). To plead fraud with particularity, a plaintiff must allege that the statement was false when made – meaning, there must have been some contemporaneous information that would have shown that the statements were false at the exact time that defendants made them. *Id*.; *see also Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) (recognizing same).

Plaintiff fails to satisfy that standard here. Plaintiff does not identify any reports, any forecasts, or any other contemporaneous information that would have shown that Defendants would not meet their forecasts. While Plaintiffs allege that NetApp's enterprise customers had reduced their spending in late 2018, and that these trends were worsened in early 2019, they allege no facts to show that the trends (which were disclosed to investors and may have been considered in making the predictions) rendered Defendants' forecasts unachievable in May 2019. On the contrary, Plaintiff alleges that according to Defendants, NetApp was "largely on track" to meet its guidance until the second half of the quarter, ECF No. 41 ¶ 64, which suggests a lack of contemporaneous information that would cast doubt to Defendants' forecasts.

Plaintiff's sole argument in this respect rests on the close temporal proximity between the forecasts and the time by which Defendants admitted they knew they would not meet the forecast. *See Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995). But the Ninth Circuit has consistently rejected the argument that temporal proximity, without more, satisfies securities fraud pleading requirements. *See Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) ("[W]e have never allowed the temporal proximity between [an allegedly fraudulent statement or omission] and [a later disclosure], without more, to satisfy the requirements of Rule 9(b)."). *Fecht* explains why: temporal proximity, no matter how close, cannot rule out the possibility that intervening events caused the inconsistency. 70 F.3d at 1083-84. Here, the Complaint expressly alleges intervening events, in the form of "a deterioration in [NetApp's] close rates" and "deals getting both pushed

out and downsized" beginning in the second half of the quarter.  ECF No. 41 ¶ 64.  Plaintiff therefore fails to plead falsity under Rule 9(b).

Furthermore, even if Plaintiff could show contemporaneous information that rendered Defendants' forecasts false, the PSLRA safe harbor applies.  Under the PSLRA, "[i]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *Cutera*, 610 F.3d at 1112; *see* 15 U.S.C. § 78u-5(c)(1)(A).  Alternatively, even if a forward-looking statement lacks "sufficient cautionary language," it still falls under the safe harbor "where the plaintiff fails to prove actual knowledge [by individual defendants] that the statement was false or misleading."  *Cutera*, 610 F.3d at 1112; *see* 15 U.S.C. § 78u-5(c)(1)(B).

Here, the May 22, 2019 investor call began by stating that "[d]uring today's call, we will make forward-looking statements and projections" and that "[a]ctual results may differ materially for a variety of reasons, including global, political, macroeconomic and market conditions."  ECF No. 43-4 at 4.  Moreover, NetApp referred investors to NetApp's 2018 Form 10-K, which further identified risks related to NetApp's sales and distribution structure and restricted visibility due to uncertain economic and political conditions.  ECF No. 43-9 at 6.  The statements that followed were unambiguously forward-looking because they involved predictions for future growth and revenue.  *See Cutera*, 610 F.3d at 1111; *Intuitive Surgical*, 759 F.3d 1058.  Plaintiff disputes that the risk disclosures were meaningful because they were warning of risks that already materialized, but, as explained above, Plaintiff alleges no facts to show that the risks had materialized on May 22, 2019.  Moreover, even if the risk disclosures were insufficient, Plaintiff has not pled that the individual Defendants had actual knowledge of the statements' falsity, for the reasons described in this section and for scienter.  The PSLRA safe harbor therefore applies.

Accordingly, Plaintiff has not adequately alleged falsity for the May 22, 2019 forecasts.[3]

---

[3] Defendants also argue that the forecasts are not actionable because NetApp disclosed the general risks that materialized in Q1 2020.  To the extent that Plaintiff proceeds on an omission theory, the Court agrees that Plaintiff has not adequately alleged the risks were hidden to investors.  However, the Court understands Plaintiff to proceed on a misrepresentation theory based on Defendants'

### 2.    June 18, 2019 Form 10-K

Plaintiff claims that the risk disclosures in the June 18, 2019 Form 10-K were false or misleading because they warned of potential risks that had already materialized.  Specifically, Plaintiff alleges that the risk disclosures warned generically that "loss, cancellation or delay in purchases" by large customers "could negatively affect our revenues in the future," when, in fact, enterprise customers were already cancelling and delaying orders.  ECF No. 41 ¶ 40.  As factual support, Plaintiff relies on Kurian's post-class statement that "[w]e were largely on track to meet our guidance until the second half of the quarter" and "then saw a deterioration in our close rates against the pipeline with deals getting both pushed out or downsized."  *Id*. ¶ 64.  Because the 2019 Form 10-K was filed in the second half of the quarter, Plaintiff claims that the risks of customer order delays and cancellations had already materialized.

On balance, Plaintiff's allegations are sufficient to plead falsity because they demonstrate inconsistent facts at the time when the statements were made.  *See Yourish*, 191 F.3d at 996-97 (a statement of the "I knew it all along" variety sufficient to allege falsity); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (abstract risk disclosures related to product liability suits misleading where company was already facing multiple lawsuits); *Berson*, 527 F.3d at 986 (disclosing "as-yet-unrealized risks and contingencies" is misleading when the risks had already materialized).  That Defendants disclosed *other* risks that materialized at *other* times in no way immunizes their May 22, 2019 statements.  Similarly, the disclosure of some materialized risks, such as IT budget reductions, does not suffice to disclose other materialized risks, such as customer order delays.  Last, that Defendants may not have known that they would miss their guidance does not render their mischaracterization of existing risks inactionable.[4]  Accordingly, Plaintiff has adequately alleged falsity for the 2019 10-K risk disclosures.

---

knowingly false and unachievable forecasts.

[4] Defendants argue that the Q1 2020 guidance miss was caused by a variety of factors, some of which were disclosed to investors.  ECF No. 54 at 10-12.  At this stage, the Court declines to consider Defendants' alternative version of events.  Plaintiff alleges that the enterprise customer sales caused two thirds of the earnings, which suffices to show materiality of the mischaracterized risks even if other risks were disclosed.  ECF No. 41 ¶ 63.

### B.       Scienter

The Ninth Circuit has emphasized that scienter should be evaluated with a "practical and common sense perspective." *S. Ferry*, 542 F.3d at 784. Under that standard, courts have rejected theories of fraud that "do[] not resonate in common experience." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Here, Plaintiff's allegations fail to raise an inference of fraud that is "cogent" and "compelling," particularly when compared to an inference of innocence or simple mistake. *Tellabs*, 551 U.S. at 323.

Read holistically, Plaintiff's allegations show that Defendants repeatedly and consistently disclosed the exact risks that materialized in Q1 2020. *See* ECF No. 41 ¶¶ 25-31. In May 2019, Defendants provided optimistic, but still conservative, guidance of 1% growth, while warning investors that risks from enterprise customer orders could cause it to miss guidance. *See id.* ¶¶ 35-37; ECF No. 43-4 at 4; ECF No. 43-0 at 6. Defendants were then on track to meet that guidance, notwithstanding the risks, until a sharp deterioration to enterprise customer orders in the second half of the quarter. ECF No. 41 ¶ 64. The allegedly false statements were made barely past the halfway quarter mark, which raises a plausible and compelling inference that Defendants simply failed to realize the problem until after the statements were made. *Id.* ¶ 41.

To bolster an inference of scienter against these competing inferences, Plaintiff relies primarily on allegations of falsity. ECF No. 47 at 20. But falsity and scienter are different requirements governed by different standards. While falsity requires showing inconsistent facts, scienter requires showing that the individual Defendants actually knew or deliberately disregarded such facts.[5] *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1061-63 (finding scienter insufficiently pled without allegations that company's management received information about reduced and delayed sales); *Webb*, 884 F.3d at 848, 856 (recognizing falsity but finding scienter allegations insufficient absent allegations that individual defendants received reports of inconsistent facts). Thus, falsity only suffices to establish scienter in narrow circumstances where, for example, the individual

---

[5] In *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015 (2005), the court noted that "falsity and scienter . . . are generally inferred from the same set of facts." However, it then continued to evaluate the two requirements separately, confirming that scienter cannot be inferred from falsity alone in most circumstances. *See id.* at 1016-24.

defendants "had actual access to the disputed information" or "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Zucco*, 552 F.3d at 1000 (quoting *S. Ferry*, 542 F.3d at 785); *see also Intuitive Surgical*, 759 F.3d at 1062 (explaining that proof under the core operations theory is "not easy"). Plaintiff fails to satisfy that standard here.

First, Plaintiff does not allege facts to show that the delayed and cancelled orders on June 18, 2019 had such prominence that it would be "absurd" to suggest that Kurian and Pasek did not know them. Even if the cancelled and delayed orders eventually amounted to an "impossible to miss" amount, Kurian's post-class statement show that the loss was attributable to "delayed" and "downsized" orders, which may have not demonstrated themselves until later in the quarter.[6] ECF No. 41 ¶ 64. Moreover, Plaintiffs do not allege any admission by Kurian or Pasek that they closely monitored contracts from large customers or that they received specific information about those contracts. *Intuitive Surgical*, 759 F.3d at 1062. Kurian's statements regarding "visibility" into customer orders due to "very, very close" relationships, while probative of scienter, also constitutes corporate puffery that lacks detail about how quickly the Company actually found out about customer intentions to delay or downsize orders.[7] Last, Kurian's post-class statement that the Company "saw" deterioration in customer orders, while also probative of scienter, fails to raise the inference that the information was communicated to Kurian and Pasek in time for the 2019 Form 10-K certification.

Absent specific admissions or allegations that information was communicated to the individual Defendants, Plaintiff relies on GAAP violations, Sarbanes-Oxley certifications, and suspicious stock sales to show scienter. None of those suffice, by themselves or in combination.

---

[6] By contrast, in *Berson*, the company's customers had already placed stop-work orders that suggested contracts worth millions of dollars would be cancelled when the statements were made. 527 F.3d at 987-89.

[7] Plaintiff argues that Kurian admitted that the Company could see changes in order purchases as they occurred because he previously stated that "things changed materially through the last week of December and really January." ECF No. 41 ¶ 27. Kurian's statement, however, does not distinguish hindsight from contemporaneous knowledge and was made in February 2018, long after the January deterioration took place.

14

Northern District of California

Sarbanes-Oxley certifications are "not sufficient, without more, to raise a strong inference of scienter." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747-48 (9th Cir. 2008); *see also Zucco*, 552 F.3d at 1004 ( boilerplate Sarbanes-Oxley certifications "add nothing substantial to the scienter calculus"). The GAAP violations here similarly merely restate the failure to disclose that risks have materialized. Indeed, Defendants here apparently complied with those same provisions for other risks that led to the missed guidance, such as reduced IT spending, which plausibly suggests that they were attempting to comply with these obligations. *See* ECF No. 41 ¶ 40; ECF No. 43-5 at 15. Last, as to the stock trades, Plaintiff admits that Kurian did not make any suspicious stock sales, which is probative of a lack of scienter. *See In re Rigel Pharma. Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012); *see also* ECF No. 43-10 (showing that Kurian held more shares at the end of the class period than at the beginning). Thus, the only individual Defendant whose stock sales are at all suspicious is Pasek, and only because of the magnitude, not because of the timing or historical practice.[8] Thus, the stock sales are only weakly probative of scienter.

On balance, the picture created by Plaintiff's allegations shows a company that consistently and repeatedly underestimated risk from macroeconomic factors on enterprise customer purchases. While less than laudable, such miscalculation does not constitute fraud, particularly where the Company was open and honest about the risks, and the risks did not fully materialize until after the statements were made. Thus, the inference of fraudulent intent or deliberate recklessness here is not more compelling than an inference of innocent miscalculation or misplaced hope, and is therefore not "strong." *Tellabs*, 551 U.S. at 310.

/ / /

/ / /

---

[8] Plaintiff alleges that Pasek sold 43% of his holdings on June 3, 2019, *before* the allegedly false statements and risk materialization. ECF No. 41 ¶ 69. Stock sales by other NetApp executives, who did not certify or otherwise make false statements, are not indicative of scienter. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) (sales by non-defendants "are irrelevant to show motive [by] . . . individual defendants"); *Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175, at *17 n.5 (N.D. Cal. Mar. 24, 2014) (similar).

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss without prejudice.  Plaintiff may file an amended complaint within 21 days.

**IT IS SO ORDERED.**

Dated:  February 1, 2021



_____
JON S. TIGAR
United States District Judge

16